Wright, J.
The point first to be considered is the jurisdiction of the court. The B. & O. R. R. Co., defendant below, is a foreign corporation. The code provides (section 68), that when the defendant is a foreign corporation, having a managing agent in the state, service may be had upon such agent.
We agree with the view taken by counsel for defendant in error, that the tendency of legislation and the policy of the law is to facilitate the obtaining of service upon foreign corporations. Their business brings them in such close connection with the people of our state, that it is desirable they should be made amenable to our laws as far as practicable, instead of having our citizens to seek other jurisdictions in which to enforce their rights. The amendment in 1868, made to § 66 (S. & S. 542), shows this to have been the purpose of the legislature. This amendment affords additional facilities for suing domestic corporations and such foreign ones as are therein described.
The court below found that Heckert was a managing agent, and we can not say that it is proper to disturb that finding upon the evidence, and the case of American Express Co. v. Johnson, 17 Ohio, 641, leaves little to be said upon the law relating to this question.
There was therefore no error in overruling the motion to quash and set aside the service.
*136 Coming now to the general merits of the case, it is alleged in the petition, that the Bridge Co. or the B. & 0. R. R. Co. were chargeable with negligence in not having lights or signals or a watch upon the barge. Indeed this omission seems to be the only ground upon which the right of recovery is rested.
The court indicated pretty clearly its opinion to be that it was the duty of the Bridge Co. to keep such lights or signals. A charge was asked by defendant below to the effect that under the law authorizing the building of the bridge, the company was allowed to obstruct navigation so far as was reasonably necessary in the prosecution of the work, if they left sufficient waterways, plainly designated, for steamboats. To this request, the court appended a qualification, stating that such obstructions were allowable in a navigable part of the river, provided they were lighted so as to give warning of their presence. And in the proviso to the 7th charge, the court indicates htat the barge should havé been lighted.
We do not, however, deem it absolutely clear that the barge was bound to keep -a light. Without going into elaborate quotations from the authorities, we think the law may be held to be, that where a vessel is anchored at night, right in the usual pathway of other vessels passing and repassing, a light is necessary as an act of prudence; but when anchored out of this usual pathway, a light is not absolutely necessary, apart from harbor regulations. A vessel coming into port is bound to keep in the proper and usual track of navigation, and if, straying therefrom, she should run down another, it would not be sufficient excuse for her to say that the vessel she thus sank displayed no light.
These rules will be found established by an' examination of the following authorities: Culbertson v. Shaw, 18 How. 584; The Bridgeport, 14 Wall. 116; Ure v. Coffman, 19 How, 56; Blue Wing v. Buckner, 12 B. Mon. 246; The Granite State, 3 Wall. 310; Owen Wallis’ L. R. 4 Adm. Ex. 175; Simpson v. Hunt, 6 Whart. 324.
*137 In The Scioto, Davies 368, Ware, J. says “that a vessel lying in the channel, where vessels are often passing and repassing, ought, in common prudence, to show a light during the night time, though when out of the channel it may not be required.” And the English rule is that vessels anchored in the channel should he protected by lights. The Industrie, L. R. 3 Adm. and Eccl. 308; Saxonia, Lush. 410.
These rules and these authorities, however, apply more particularly to cases of simple collision between vessels, where their own acts aloné are considered. But in this case a consideration is involved, not existing in ordinary collisions, and that is the fact of the bridge and the rights arising under its authorized construction. Had there been no bridge there, and no construction of it begun, and had this barge been simply anchored out in the river, without lights, and in a place where it is usual for boats to run, it would doubtless be more difficult for her to defend herself from the imputation of neglect than it is under the circumstances being considered.
The construction of this bridge was authorized by act of Congress. Such things as were reasonably necessary to be done, in the progress of that construction, were lawful. Doubtless the Ohio river is a navigable stream, as the court held in 13 Howard; but it is also without doubt, that the bridge, being a structure authorized by law, it was but the exercise of a right to obstruct navigation, in so far as its erection occasioned a necessity therefor. This barge therefore might properly be used, and one of its prerogatives was, to interfere with the movements of other vessels, if its work could not be done without. It is hardly a correct use of language to speak of the barge as a nuisance, even moored where she was and without a light. She had a right to be moored, if in the prosecution of her work it was necessary, or even convenient, and the absence of a light did not make her a nuisance until it is shown that it was incumbent upon her to maintain one. The case is very different from that of Porter v. Allen, 8 Ind. 1. In that case a log endangered defendant’s property, and he *138 towed it to another part of the river and there left it, and a steamboat struck it and sunk. The log, indeed, was not left in the channel, but defendant was acting as a trespasser in doing what he did; for the court holds that he had no light to leave the log where boats could and did go. But the barge certainly bad a right to be in the river, and to be just where she was.
As has been remarked, it can not be said she was a nuisance where she was, at least, until it is shown that she was bound to display a light. If this be first satisfactorily ascertained, and this omission of duty solely occasioned the disaster, then there is a negligence for which defendant would be responsible. But in determining whether the absence of a light is such negligence, it should be inquired whether a person of ordinary prudence would consider a light necessary, then and there, to warn steamboats oft'. It was a place, it is true, where steamboats could go, so far as depth of water is concerned. But sufficient water is not the only thing necessary to successful steam-boating; circumstances of safety are also required. The ordinary channel was a long distance off — between piers 3 and 4. Boats rarely, if ever, came between piers 2 and 3 and this fact would be taken into account by a man of prudence, iu making up his judgment, as to the necessity of a light on the barge. He might well reason, that as boats never come in this vicinity, a light is simply useless. A light is to no purpose on a pathway that is never traveled.
The question of negligence is to be determined by the consideration, whether or not a party has guarded against those things which he might reasonably have cause to anticipate. Blackburn, J., in Smith v. Leuchie & S. W. R. R., L. R., 6 C. P. 14.
While, therefore, the mooring the barge in the well-known channel might charge her owners with knowledge of the fact that her position was a dangerous one to other vessels, and so might make the absence of a light a circumstance of negligence, upon the other hand, the fact that *139 she lajr where pilots didnot ordinarily run their boats, goes to show‘that the same necessity for lighting did not exist, and that a failure, in this respect, was not, of course, a want of prudence.
But even conceding that the omission to light the harge was negligence, was it that causa próxima which occasioned the disaster ? This requires an examination of the alleged acts of negligence in the steamboat Rebecca; for, if these were such that the collision would have occurred, light or no light, the fault would be attributed to plaintiff.
The plaintiff in error alleges that there was contributory negligence on the part of the Rebecca in these particulars :
1. In leaving what was the usual channel for steamboats, which was between piers 3 and 4 and 4 and 5, and passing to the West Virginia side, between piers 2 and 3, where boats were not accustomed to go.
2. In not maintaining a sufficient lookout.
3. In running at full speed, just above and through the piers.
We will consider these alleged grounds of negligence :
First. As to leaving the usual channel.
As to this, it is very clear that the usual channel was between piers 3 and 4 and 4 and 5. It is questionable if a single instance is shown of a descending boat going between piers 2 and 3. One or two s'ay they have seen such a thing; but certainly, the great preponderance of the evidence is that boats avoid that course. Pier No. 4 stands in about the deepest part of the river, and is generally designated by pilots as standing in the channel. The spaces between piers 3 and 4 and 4 and 5 are spoken of as the “ channel spans.” The lights on these piers are spoken of as indicating the channel.
Here is the deepest water of the river, and here is the widest waterway, being 137§ feet wider than the distance between the other piers. The river men contributed $30,000 to have the spans widened and for a second channel span, as the law provided that there should be a chan *140 nel span of not less than 300 feet and the next adjoining not less than 220 feet. These two, therefore, were made, each 322f feet in width.
Another reason governing the course of boats about to land at Parkersburg was, that by running piers 3 and 4 or 4 and 5, a wider berth was given to round to upon the West Virginia shore, whereas a boat running piers 2 and 3 would be compelled to hold over to the Ohio shore again to make the necessary turn for a landing.
It is, therefore, proper to say that the proof shows that the ordinary and usual channel is between 3 and 4 and 4 and 5. It is true that there is plenty of water between 2 and 3, and counsel for plaintiff below maintain that “ the right of n avigation is only limited by the capacity of the water to float a boat,” and therefore claim that the Rebecca had the right to go where she did.
It may be, as far as mere legal right is concerned, that the Rebecca had the right to run any couise she chose, but the fact that she was sunk in so doing suggests the query whether or not she was prudent in the exercise of all her rights. One may have the right to do a given thing, still it may not be wise or prudent to do it. It may undoubtedly be said that a boat may run anywhere she can, so far as her own rights merely are concerned; but when we come to consider the rights of others, the proposition is not so clear. The law of the Mississippi ri ver is that the ascending boat must run near the shore, the descending boat in the middle of the river. Eor violating this rule, in Shirley v. Richmond, 2 Woods, 58, a boat was condemned. The Richmond was coming up within one hundred and fifty yards of the east bank, and the Sabine run her down. The Sabine was made liable for the damages, and it was not sufficient defense that she was exercising the right of going wherever the water was sufficient.
The cases of the John L. Hasbrink, 3 Otto, 405, and Goslee v. Shute, 18 How. 463, show that vessels are liable in damages for collisions, from the fact that they are at the time out of the ordinary and usual course of navigation.
*141 The law of the sea and river has established certain rules and regulations with reference to the running of vessels, and the right to go wherever there is water enough must be governed by such rules and regulations. Williamson v. Barrett, 13 How. 101; 1 Parsons on Shipping and Admiralty, 583, n. 1.
The very fact that these rules are established by statute, by boards of inspectors, and by custom, show that there is and must be some limitation upon the right of a vessel to run wherever she may see fit, provided she can.
It is obvious that if this boat had the right to run wherever there was sufficient water to float her, every other vessel had a similar prerogative, and there must be some law to control and regulate rights that in their nature conflict. Angelí on Watercourses (sec. 541a) says:
“ The general doctrine to be deduced from the authorities in reference to the use of navigable rivers or public streams as public highways, is that each person has an equal right to their reasonable use. What constitutes reasonable use depends upon the circumstances of each particular case, and no positive rule of law can be laid down to define and regulate such use with entire precision, so various are the subjects and occasions for it, and so diversified the relation of parties therein interested. In determining the question of reasonable use, regard must be had to the subject-matter of the use, the occasion and manner of its application, its object, extent, necessity, and duration, and established usage of the country. . . . Every person has an undoubted right to use a public highway, whether upon the land or water, for all legitimate purposes of travel and transportation; and if, in so doing, while in the exercise of ordinary care, he necessarily and unavoidably impede or obstruct another temporarily, he does not thereby become a wrong-doer, his acts are not illegal, and he creates no nuisance for which au action can be maintained.”
Inasmuch, therefore, as the Rebecca had departed from the usual and ordinary channel, and as it can not be successfully maintained that she might run anywhere in the *142 river simply because there was "water enough, and without reference to the rights of others, we must inquire what it was incumbent upon her to do in entering upon and continuing in her unaccustomed course.
The steamboat might use any part of the river before the bridge was authorized or the piérs built; but when these became accomplished facts, the steamboat was certainly shorn of some of her privileges. It was certainly her duty in descending the river to pass the locality of the bridge with greater care than was used before its construction ; for, whereas she might have run just where pier No. 4 now stands, she can do so no longer, and her right of passage generally is restricted to the spans, it being without such restriction before. If the construction of the bridge curtailed the rights of the boat as to that part of the river recognized as the usual channel, what effect did it have as to that part of the river which was not the usual channel? Manifestly in running the usual and ordinary course, usual and ordinary care was required. Rut where an unusual course is taken, one not the ordinary course of navigation, clearly a degree of caution is required more than usual, more than ordinary, and corresponding with the new risks which are taken.
Perhaps the pith of the law on this subject can not be better stated than it is in Pluckwell v. Wilson, 5 C. & P. 375: “A person driving a carriage is not bound to keep on the regular side of the road; but if he does not, he must use more care, and keep a better lookout to avoid collision than would be necessary if he were on the proper part of the road.”
Upon this phase of contributory negligence, defendant asked charges 13, 14, and 15, and made the exceptions 5, 6, and 7. Exception 7 was to a portion of the charge, saying, in effect, that the boat had as much right to run through one span as through another; and nowhere in the charge do we find it indicated that more care was required in one passage than in another. And the jury might well have thought that the steamboat was held to no greater *143 caution in passing between piers 2 and 3 than between 3 and 4. They should have beeu told that when the pilot forsook the usual and ordinary channel and took another, more care was required than when he was following the well established route.
It does not appear that any such extra care was taken, and its omission might well be considered contributory negligence; and as the chax-ge does not call attention to this requirement, we think it was erroneous in such omission.
The court seemed to be of the opinion that the only negligence on the part of the steamboat, nesessary to be considered, was that occurring at the moment of the collision.
In charge 6, excepted to, it holds the boat to “ ordinary care exercised after the discovery of the barge.” And again, upon the subject of the lookout, it is said : “ If the jury are satisfied that such watch was omitted, and that such omission at the time of the collision contributed,” etc. Thus confining the question of negligence, on the part of the boat, to what happened at the time of, or just before, the collision, and ignoring all consideration of the imprudence, unskillfulness, or carelessness of the pilot in bringing his vessel into such a position as rendered the catastrophe inevitable. If one is inconsiderate enough .to voluntarily bring himself into circumstances of danger, it does not relieve his fault that he does all in his power to pi’event accident when the lateness of such efforts necessarily renders them fruitless. As is said in The Vanderbilt, 6 Wall. 226: “Unless precautions are seasonable, they constitute no defense.”
In 1 Parsons on Ship, and Adm. 529, it is said : “Nor is it enough to show that the collision could not have been prevented at the moment, if it might have been by previous precautions.”
In The Virgil, 2 W. Rob. 205, Lushington said: “ If a vessel charged with having occasioned a collision should be sailing at the rate of eight or nine miles an hour, when she ought to have proceeded only at the speed of three or four, it will be no valid excuse for the master to aver that *144 he could not prevent the accident at the moment it occured, if he could have used measures of precaution that would have rendered the accident less probable.” Steamboat New York v. Rea, 18 How. 225; The Clement, 2 Curtis C. C. 363; Wakefield v. Governor, 1 Cliff. C. C. 93-97; Genessee Chief, 12 How. 461.
The jury, therefore, should have been called to consider, not only whether the boat exercised the required degree of care at the moment of, or just before, colliding, but they should have also been told to examine whether, under all the circumstances, the pilot had exercised proper skill and judgment in bringing his boat where she was. Whether such skill and judgment would have' led him to fox-sake the usual and safe course, for one unusual and proving to be unsafe. Whether, after leaving the channel,. he so conducted his vessel, in the matter of her speed, and of watchfulness, as the exigexxcies of a position not usual •and ordinary rendered imperative.
The next matter urged as a circumstance of contx-ibutory negligence, is the want of a proper lookout.
The captain, who, it appeai-s, had been performing this, indiscriminately with his other duties, had quit his labors and gone to bed. The second mate was then filling the office of lookout, upon the hurricane roof, but at the precise moment that his services wex-e most required, when the dangerous appx-oaeh toward the bridge piers demanded his highest vigilance, he ceased it altogethex-, and went off to attend to other matters. The excuse or reason given for this very extraordinary performance on the part of the mate, if he is to be considei-ed as filling the character of lookout, is, that the x-oustabouts who wex-e to get out the freight at Pax-kersbux-g were asleep downstairs, and upoix being summoned, were defective in alacrity, whereupon the mate left his post, aud went below to wake them ujx.
Upon this state of fact, the coux-t ehax-ged the jux-y to inquire, if any officer was on watch: “ Whether he was at his usual place, or if not, whether other duties called him elsewhere in the boat; for wherever the duty of a person *145 on watch.calls him, that, for the time being, is his proper place.”
We understand that the place, as well as the duties, of a a lookout are properly designated by his title. His office is important, and can not be confounded with anything else. Hpon this, authorities are very clear.
In The Ottawa, 3 Wall. 273, the court say: “Steamers are required to have constant and vigilant lookouts stationed in proper places on the vessel, and charged with the duty for which lookouts are required, and they must be actually employed in the performance of the duty to which they are assigned. They must be persons of suitable experience, properly stationed in the vessel, and actually and vigilantly employed in the performance of that duty.” The syllabus of the same case is as follows:
“ Lookouts must be persons of suitable experience, properly stationed on the vessel, and actually and vigilantly employed in the performance of their duty. When acting as officer of the deck, and having charge of the navigation of the vessel, the master of a steamer is not a proper lookout, nor is the helmsman. Lookouts should be stationed on the forward part of the vessel, where the view is not in any way obstructed. The wheel-house is not a proper place, especially if it is very dark, and the view is obstructed.”
In The Comet, 9 Blatch. 327, it is said : “ In such circumstances, and in view of other suggestions presently to be made, the importance of a lookout, especially devoted to that duty and vigilant in its performance, can not be overstated.” And again : “ It is not necessary to repeat, what has so often before been said, that in circumstances calling for the watchful vigilance of a lookout, the master, or the mate, charged with the general management of the vessel, is not competent to act at the same time as lookout..” Chamberlain v. Ward, 21 How. 570.
In the case of “ The Northern Indiana,” 3 Blatch. 106, it is said : “ The watchman, or man of all work, who es *146 teemed it his doty to lookout ahead only when .he could find nothing else to do in discharging his multifarious duties, was not a proper or sufficient lookout, even'if he had the competent skill for that service. The mate was the officer of the deck, holding the temporary command of the vessel, and continually liable to be called to the discharge of duties inconsistent with the keeping of a constant and vigilant watch ; and he ought not to have been relied upon for that purpose. In such a steamer as the Northern Indiana, his proper duties, as officer of the dock, -would materially interfere with the attempted discharge of the additional duties of a lookout, and render him less reliable for that purpose than the person at the wheel, who, it has been seen, is always held insufficient. If the officer of the deck assumes to act as the lookout, the proof must be clear and satisfactory that he was, during all the time a lookout was material, in the proper position, and constantly and vigilantly discharging that duty.” The New York v. Rea, 18 How. 223; The Catharine v. Dickenson, 17 How. 110.
Authorities like these might be multiplied to any extent, rand they clearly show that a lookout is not a lookout when ¡he is attending to any other business. That portion of the •charge, therefore, which in its statement allows the jury to ¡suppose, that when the lookout, though engaged in other matters than that of a constant, vigilant watch, is still in ■the performance of his duties, and that the requirements <of the law are thus fulfilled, is misleading.
The tenth proposition excepted to was this: “ Ton will .also find from the evidence whether, if the person on watch :had been at his usual place, he would probably have been .able to discover the barge, on such a night, in time to have avoided a collision and consequent injury. If you find that •he would not, his absence would not be such negligence as •would prevent the plaintiff from recovering.”
This was calculated to convey a false impression. Where ■a vessel is guilty of such a fault as the want of, or an in■sufficient lookout, and an accident happens, she must show, mo.t only .that such fault did not probably contribute, but *147 that it could not by any possibility have done so. Dr. Lushington says, in The Mellona, 11 Jur. 784 :
“I am of opinion, in point of law, that if there has been previous negligence in keeping a good lookout, then that party is responsible for all the consequences which might, by possibility, have been prevented. If, indeed, a party is to blame, but by no possibility whatever could injurious consequences result from that culpability, then the court might not hold him responsible.”
In the case of The Pennsylvania, 19 Wall. 126, the rule in the case of the violation of a duty prescribed by statute, is stated thus : “Although if it clearly appears that a fault committed by a vessel has had nothing to do with a disaster which has occurred, the liability for damages is against the vessel alone which has produced the disaster, still where the vessel has committed a positive breach of statute, she must show not only that probably her fault did not contribute to the disaster, but that it certainly did not, that it could not have done so.”
To this effect also are The Brig Emily, Olcott, 138; Northern Indiana, 3 Blatch. 92; The Atlas, 10 Blatch. 459; Reed v. Steamboat New Haven, 18 How. 482.
Tlie numerous authorities cited show that a lookout is indispensable, and that an omission in this particular is held by the admiralty courts to be negligence, as matter of law. Negligeuco is generally a mixed question of law and fact, to be submitted to the jury, under proper instructions. But where the facts are admitted or undisputed, the question of negligence becomes one of law.
In cases of persons injured at railroad crossings it is held that a failure to use one’s senses to discover the approach of a train, when so doing would have prevented an accident, is negligence, as a matter of law, and recovery can be had. Artz v. C. R. I. & P. R. R., 34 Iowa, 153; Gorten v. Erie R. R., 45 N. Y. 660; Reynolds v. Railroad, 58 N. Y. 248; Mitchell v. Railroad, 64 N. Y. 655; Railroad v. Crawford, 24 Ohio St. 631; Railroad v. Elliott, 28 Ohio St. 340; Pennsylvania R. R. v. Rathgeb, ante, 66.
*148 We think, therefore, that the admiralty rule should be adopted as a rule of our common-law courts, and that tlie absence of a proper lookout should be held to be negligence, as matter of law, and that where an accident happens the party in fault in this particular will be responsible, unless able to show by clear and satisfactory evidence, that the injury could not possibly have been avoided, even if there had been a proper lookout.
Should it clearly appear that the absence of a lookout could in no way have affected the result, then a recovery can not be had, if such omission were'the only fault, as in the case of Shirley v. Richmond, 2 Woods, 58. There the court say: “But even if there had been no lookout, it would not alter the case, for the pilot of the Richmond (the defendant), saw the Sabine (plaintiff’s boat), as soon as she rounded the point, which was at as early a moment as any man on the lookout could have seen her.” And the syllabus of the case is, “A neglect to keep a proper lookout, which does notin anyway contribute to a collision, can not be alleged as a ground on which to recover damages caused by the collision.”
The third ground of alleged contributory negligence is the running of the Rebecca at full speed just above and through the piers.
It appears that the boat came on with a full head of steam, at the top of her speed, about fourteen miles an hour, and was running at that rate when she struck the barge.
Defendant asked the court to charge that if the usual course of navigation was to run the piei’s at a reduced speed, the boat was not justified in using full speed, and if by so doing the collision was occasioned, when the usual rate -would have avoided it, there could be no recovery. This was refused as asked, but was given with a qualification, and the court further left it to the jury to say whether this style of running was dangerous where obstructions were anticipated. But in the previous part of its chai’ge the court had in effect said that the barge ought to have *149 had a light upon it, and without such light, the pilot was not expected to be on the lookout for it, or to anticipate its presence. The whole effect of the charge, as we regard it, being that the pilot might run at any rate he pleased, and it was not negligence. The court might not have meant, exactly this, but the jury might have easily inferred it.
On this subject it is said in The Pennsylvania 19 Wall. 134, quoting from the case of The Europa: “ This may be safely laid down as a rule on all occasions, fog or clear, light or dark, that no steamer has a right to navigate at such a rate that it is impossible for her to prevent damage, taking all precautions at the moment she sees damage to be probable.”
That an undue rate of speed is made ground of condemnation is shown by numerous admiralty cases. Newton v. Stebbins, 10 How. 606; McCready v. Goldsmith, 18 How. 89; Rogers v. St. Charles, 19 How. 108; The Rose, 2 W. Rob. 2; The Syracuse, 9 Wall. 672; The Pepperrell, 1 Swabey 12; The Vivid, 1 Swabey, 88; The Despatch, 1 Swabey, 138; The Perth, 3 Hagg. 415.
Under all the circumstances of the case, therefore, we can not but think the pilot was guilty of negligence in not slacking his rate of speed. The evidence is apparently conflicting on the subject, whether it is best to slacken speed in running piers. But, after all, this conflict may be more apparent than real. We understand those who favor fast work, to say not more than this: That when the pilot is sure of his bearings, and knows that he is in the right course, then he may put on all steam. The reason given is that thus the danger is soonest over, the boat minds her helm better, and is not so apt to be carried by cross currents against the abutments. But certainly no boatman can mean to say that it is a desirable or prudent course of navigation to dash headlong at bridge piers, not knowing whether his boat is going between them or square into them. The pilot who would advise or justify such business would surely endanger the continuance of his license.
We can not therefore resist the conclusion that the pilot *150 was guilty of negligence, to use no stronger term, in leaving the proper channel, as he did, with no lookout to assist him in his untried course, and running his boat at fourteen miles an hour, at a localiiy, the dangers of which at all times, and under most favorable circumstances, required a great degree of caution. And wo think the court should have called more particular attention to these facts, and not 'allowed the jury to suppose that the pilot, throughout the whole affair, only did what any pilot might have done, and would have been justified in doing.
But there is another fact in the case, a fact which impresses us as being one of the first and last importance, though it does not appear to have been so regarded in the courts below.
We have thus far treated the management of the pilot and discussed it, as though lie was perfectly sure of his course, and was running his boat under the direction of full knowledge and the best advised intelligence. But the fact was not so. It clearly appears that he did not know where he was. Piad he been blind, he could not have been more completely oblivous to all his surroundings, than he was, at the moment he struck. lie thought and still thiuks that he ran between piers 3 and 4, and that he struck something upon the Virginia side of No. 4.
Counsel for defendants in error appear to intimate a doubt as to the course the boat actually took, stating it hypothetically, “ if she did,” go between piers 2 and 3. If she did not, if she went between 3 and 4 and struck something moored to pier 4, there can be no recovery in this action, for it is not pretended that plaintiff in error had anything lying at that pier. But we think there can be no doubt about this, nor can there be any doubt of the pilot’s error.
At what point he lost himself, does not appear, nor can it be made to appear, as he does not yet seem to know that he was lost. But it must have been some distance above the bridge, probably half a mile or more, when his mistake began.
Can there be any possible degree of prudence or care in *151 running a steamboat through dangerous places of navigation, at full speed, with no watch, in the night time, under the guidance of a pilot who does not know where he is nor whither he is goiug?
We have endeavored to show that running a boat thus, when managed intelligently would be a grave error; how much more so, when to all this is superadded the further fact, of total ignorance of localities. The court below does not seem to have laid stress upon this all important fact, as should have been done. It illustrates the case in some of the points we have been considering. As to the claim the pilot makes that there should have been a light ou the barge, and if there had been the accident would not have happened. As he explains himself, the trouble with him seemed to be not too few lights but too many, and it is therefore difficult to see how more could have helped him. Having clearly mistaken his course, he endeavors to account for that mistake by saying that he saw the pier lights, but there were some other lights upon a certain steamboat lying at the Parkersburg wharf, resembling the pier lights iu appearance, elevation and other particulars, and these confused and caused him to lose his reckoning. As.he was already wildly astray as to where he was going, it is not certain but that more lights might have increased his confusion, instead of having any opposite effect.
The relation of this mistake of the pilot to the question of a necessity for a lookout is obvious. Had there been an intelligent officer upon the hurricane deck, or in any other place proper for a lookout, and had he been wide awake, it •is hardly within the range of possibility that ho should not have been able to discover the pilot’s error, in time to have avoided danger. Either he would have discovered the mistake or demonstrated his own incompetency, as the pilot has done. No better case could be found, than this one, for illustrating the propriety and wisdom of the' admiralty rules upon this subject. When the-court said to the jury: “ You will also find from the evidence whether if the person on watch had been at his usual place, he would have *152 been able to discover the barge, on such a night, in time to have avoided the collision and consequent injury. If you find that he would not, his absence would not he such negligence as would prevent the plaintiff from recovering it would have been more pertinent to have said that the absence of a lookout was an error in point of law. Thus much having been premised, it is apparent that in point of fact the error was fatal in its consequences.
Eor the errors to which we have referred, we think the judgment of the court below should be reversed.

Judgment reversed.