## MASON et al. v. PEWABIC MIN. CO. et al.

### (Circuit Court of Appeals, Sixth Circuit. December 4, 1894.)

### Nos. 167–170 and 182–190.

1. CORPORATIONS — DISSOLUTION — DISPOSITION OF ASSETS — EMPLOYMENT OF COUNSEL.

The charter of the P. Co. expired in 1883. The business of the company was continued for about a year, and a stockholders' meeting was then held, at which an attempt was made to organize a new corporation to continue the business, taking the property of the P. Co. at a valuation of $50,-000, issuing stock to the shareholders of the P. Co., share for share, or paying a proportionate part of $50,000 to any shareholders who did not accept stock. This plan was agreed to by a large majority of the shareholders, but was rejected by the rest, who brought suit against the old and the new corporations and the directors, who were the same in both, claiming the right to have the property of the P. Co. sold, its debts paid, and the surplus distributed among the shareholders, and claiming also an account from the directors of their receipts and disbursements in conducting the business of the company, after the expiration of the charter. This suit was strenuously defended through a long series of proceedings, but resulted in a decree in favor of the complainants, as prayed in the bill, and a sale of the property of the P. Co. for $710,000. The counsel engaged in the defense applied for payment out of this fund. *Held,* that the suit involved only a controversy between the stockholders of the P. Co. as to their rights in its assets, and did not involve the corporate interests of the company, and that the directors were not authorized to use the corporate assets or credit in employing counsel to represent the contention of the majority stockholders and further their interests, nor were the counsel so employed entitled to be paid out of the proceeds of the sale, but must look to the interests which they really represented.

2. SAME—COMPENSATION OF OFFICERS.

*Held,* further, that the president of the P. Co., who, before the dissolution of the company, had received no salary, and who was one of the directors who shared in and promoted the plan of the majority stockholders, was not entitled to any payment for his services as president after the dissolution.

3. SAME—LIABILITY FOR BORROWED MONEY.

*Held,* further, that the liability of the P. Co. for money borrowed after its dissolution depended upon the existence of a necessity for the loan for the purpose of closing up the business of the company, and that a claim asserted against the fund for money loaned by a company which appeared to have used the property of the P. Co. between its dissolution and the sale, and to have been under the management of the same persons who were in control of the P. Co., could only be allowed after a probing of the accounts of the two companies, and to the extent of the balance due to such company for money actually loaned the P. Co. for necessary and proper purposes.

Appeal from the Circuit Court of the United States for the Western District of Michigan.

This was a suit by Thomas H. Mason and others against the Pewabic Mining Company and its directors to obtain a sale of the property of that company and an accounting. Cahill & Ostrander, C. E. Hellier, F. A. Baker, J. Lewis Stackpole, R. M. Morse, T. H. Talbot, D. L. Demmon, T. H. Perkins, and the Franklin Mining Company all presented claims before the master in the cause, for counsel fees, salaries, and moneys loaned, all of which claims were disallowed by the master. The circuit court entered a decree confirming the master's report. The claimants appeal.

The Pewabic Mining Company was a Michigan corporation, whose corporate life expired in April, 1883. Its capital stock was divided into 40,000 shares, of $25 each. It owned a large and valuable body of. land immediately on the famous Pewabic copper lode, and actively prosecuted the business of copper mining during the period of its charter life, and was still regularly engaged in extensive operations at the time this litigation began (March 31, 1884), notwithstanding the expiration of its charter nearly a year before. At an annual stockholders' meeting in March, 1884, an attempt was made to organize another corporation, called the Pewabic Copper Company, to which a majority of the stockholders resolved that the assets of the old corporation should be transferred, at a fixed valuation of $50,000. This plan of organization contemplated that the stockholders in the old company should become stockholders in the new for an equivalent amount of the old stock, or, if they did. not elect to do this, then they were to receive in cash their proper portion of the assets as of the valuation of $50,000. Upon the vote of shares this plan was adopted and approved, the vote standing 27,919 in favor of to 6,754 against it, and a transfer of the assets and property of the old company was directed to be made by the officers of the defunct company. The minority were wholly unwilling to agree to this arrangement, as desired by the majority. They were neither willing to continue their capital in the new corporation, nor to accept a pro rata upon a valuation of $50,000. They insisted and demanded that there should be a public sale of all the property of the corporation; that its debts should be paid; and that the surplus should be distributed pro rata among all the shareholders. Deeming this to be their legal right, three shareholders, to wit, Thomas H. Mason, William Hart Smith, and Sullivan Ballou, filed their bill in this case, making defendants the old corporation, the Pewabic Mining Company, and the new corporation, the Pewabic Copper Company, and the officers and directors of the old as well as the new company, who were the same persons. The object of the bill was to prevent the proposed transfer and sale of the property and assets of the Pewabic Mining Company to the Pewabic Copper Company, and to obtain a public sale of all the property of the Pewabic Mining Company, for payment of debts and ratable distribution among all shareholders. The bill also alleged that the regular business of mining had been carried on by the officers and directors of the old company, notwithstanding the expiration of its corporate life, and prayed that they should be required to account for all receipts and expenditures in carrying on the business of the company after corporate dissolution. Such proceedings were had under the original bill as resulted in a decree in accordance with the contention of the minority complainants.

The circuit court held: (1) That the minority shareholders could not be coerced by a majority into an election between taking shares in the Pewabic Copper Company in lieu of their shares in the Pewabic Mining Company, and receiving in cash a pro rata share of the assets, upon an arbitrary valuation of $50,000. (2) That court held that, upon the dissolution of the corporation by expiration of its charter life, the shareholders were entitled to have a public sale of all the property of the corporation, and a distribution of the proceeds of such sale, after payment of the corporate debts. (3) That the complainants were not entitled to an accounting with the old board of directors of the Pewabic Mining Company, on account of the continuance of the general corporate business of said company after expiration of its charter. Mason v. Mining Co., 25 Fed. 882. There was an appeal to the supreme court by both the complainants and defendants, the complainants appealing from so much of the decree as denied an accounting with the Pewabic directors. The decree of the circuit court was confirmed in so far as it had been appealed from by the defendants, but was reversed in so far as the complainants had been denied an accounting with the officers and directors. Mason v. Mining Co., 133 U. S. 50, 10 Sup. Ct. 224. The case was remanded to the circuit court, with directions that a special master should be appointed, that an account of the assets and indebtedness of the Pewabic Company should be stated, and that an accounting should be had before said master with the officers and directors of the Pewabic Mining Company as to the business conducted by them after the expiration of the Pewabic charter, and with directions that the property should be sold at public sale, for the purpose of pay-

ing debts and distribution of the surplus assets among the shareholders. In May, 1890, a decree was entered in the circuit court upon the mandate of the supreme court, referring the cause to the Honorable Peter White, as special master, for an account of the debts and assets, and for an accounting with the officers and directors of the Pewabic Mining Company. The special master reported to the court that all of the indebtedness of the Pewabic Mining Company, which was in existence at the time this litigation was begun, in 1884, had been settled and paid. He reported that a number of claims which had arisen pending the litigation, for money borrowed and expended by the defendants, and for professional services claimed to have been rendered to the defendant company in and about the pending litigation, had been filed. He reported that the gross amount of the claims thus filed somewhat exceeded $80,000. He also reported that the time was exceedingly propitious for a sale of the property, and recommended that a sale should be ordered at once, without waiting to ascertain the amount and validity of the claims thus asserted against the assets. This report was confirmed in so far as provisionally to establish an upset price at the sale which was by the same decree ordered to be made after due and extensive advertisement. Twice thereafter, upon application of the defendants, the sale was postponed. But finally, upon the 24th day of January, 1891, the property was exposed to public sale, for cash, and reported as sold to complainants, Mason and Smith, for the price of $710,000. Some effort was made to prevent a confirmation of this sale, and to have the biddings reopened. The circuit court, upon consideration of all the circumstances, declined to reopen the bidding, and confirmed the report of the sale. From this decree the defendants again appealed to the supreme court of the United States, where, upon full argument, the decrees of the court ordering and confirming the sale were in all particulars affirmed. Mining Co. v. Mason, 145 U. S. 349, 12 Sup. Ct. 887; Marcus v. Mason, Id. Subsequently the special master, according to previous direction of the court, made report upon the various claims asserted against the Pewabic Mining Company, or the proceeds of the sale of the property of that company, in the hands of the master. That report was in all respects confirmed, over exceptions interposed by nine different interveners, whose claims were litigated. Each of these alleged creditors of the Pewabic Mining Company assigned error upon the decree of the court, and prayed and was allowed a separate appeal. These nine appeals involve in many respects identical questions, which have been heard and will be decided together. At the same term of the court at which the report of the special master upon these intervening claims was confirmed, four of the interveners filed petitions. These four petitions were interposed, respectively, by J. Lewis Stackpole, Robert M. Morse, Charles H. Hellier, and Cahill & Ostrander, asking an allowance, out of the funds arising from the sale, for the same professional services covered by their claims filed with the special master, and adversely reported. The circuit court, after confirming the master's report, disallowed and dismissed the petitions aforesaid. The petitioners, in addition to their appeal from the decree confirming the master's report, were allowed appeals from the decree dismissing their respective petitions. These four last mentioned appeals were heard along with the appeals from the decree confirming the report of the special master.

Cahill & Ostrander, in pro. per., and Fred. A. Baker, in pro. per., for appellants.

Dickinson, Thurber & Stevenson (Don M. Dickinson and Alfred Russell, of counsel), Thomas H. Talbot, in pro. per., Daniel L. Demmon, in pro. per., and Thomas H. Perkins, in pro. per., for appellees.

Before TAFT and LURTON, Circuit Judges, and RICKS, District Judge.

LURTON, Circuit Judge, after stating the facts, delivered the opinion of the court.

The appeals of Thomas H. Talbot, Cahill & Ostrander, Fred. A. Baker, J. Lewis Stackpole, Charles E. Hellier, and Robert M. Morse involve the liability of the Pewabic Mining Company, or of the fund in court arising from a sale of its assets, for professional services rendered to that company or to the fund since this litigation arose. The facts applicable to each appeal are the same, and what we might say as to one would be equally pertinent as to all, except in so far as the services rendered by Mr. Talbot began at an earlier date in the history of this litigation than those of his subsequent associates. The six appellants above mentioned are gentlemen of the legal profession, and have during the pendency of this very protracted litigation rendered valuable professional services in this case to those litigants named in the original bill as defendants. The defendants named therein were the Pewabic Mining Company, a corporation created under the law of Michigan, whose charter life had expired nearly a year before this suit was instituted; the Pewabic Copper Company, a corporation of the state of Michigan, organized in 1884, and being the same corporation to which the officers and directors of the Pewabic Mining Company purposed conveying all the property and effects of that company, in pursuance of the stockholders' resolution heretofore mentioned. The other defendants were Johnson Vivion, Henry Billings, Thomas H. Perkins, A. B. Butterick, and D. L. Demmon, all being officers and directors of both the old and new corporations.

The principal contention of appellants is that their services were rendered upon an express employment by the Pewabic Mining Company, and that these services were rendered in good faith and with diligence, in the proper interests of that corporation and the general body of shareholders. They insist that, notwithstanding the expiration of the charter life of that company, under the statutes of Michigan the corporate life was continued for the purpose of winding up its affairs and disposing of its property; and that the authority thus conferred extended not only during the period of three years mentioned in the statute, but for the entire time that any litigation begun during that time should continue; and that, under the statutory powers conferred by the Michigan act, the officers and directors of the defunct corporation had power to bind and obligate that company for all professional services deemed by them reasonably necessary.

The constitution of Michigan prohibits the granting of any charter to a corporation, of the class to which the Pewabic Mining Company belonged, for a period longer than 30 years. Any legislation authorizing an extension of the original corporate life and corporate powers for a period beyond 30 years would obviously be ineffective, as prohibited by the constitution. Attorney General v. Perkins, 73 Mich. 303, 41 N. W. 426. At the common law, when the corporate life was terminated, by limitation, forfeiture, or otherwise, the corporation ceased to exist in legal contemplation for any purpose whatever. No suit could be maintained in its name or against it, and pending suits abated as in the case of the death of a natural person. Bank v. Colby, 21 Wall. 615. But this common-law ex-

tinguishment of remedies, and the common-law consequences, such as reverter and escheat, were obviated by courts of equity, which regarded the corporation as a mere trustee, the creditors and stockholders being the cestui que trust. The death of the trustee was not allowed to defeat the trust nor to destroy the rights of the beneficiaries. In business corporations the capital is contributed by the stockholders, and they are justly entitled to be regarded as the equitable owners of the corporate assets, after payment of corporate debts, and their relations inter sese are to be regarded as analogous to the relations of partners. Equity, therefore, by reason of the flexibility of its remedies, was able to obviate the harsh common-law consequences of dissolution, such as reverter and escheat, by administering the assets as a trust. This doctrine, so well known now to students of equity, is elaborately considered in the opinion of Justice Campbell in Bacon v. Robertson, 18 How. 480. In most, if not in all, of the states of the Union, statutes of like tenor to that of Michigan have been passed continuing the corporate life pro hac vice, for the purpose of enabling the corporation to wind up its affairs and convert its assets into money for payment of debts and distribution of surplus among stockholders. These statutes are embodiments of equitable doctrines, and afford legal remedy where before there was none. Mor. Pub. Corp. §§ 1036, 1037. The Michigan statute operated only to continue corporate capacity that suits might be prosecuted by or against it, that its business might be wound up in an orderly way, its corporate property disposed of, and distribution made among the stockholders after payment of debts. That the purpose of the statute was purely administrative is made positive by the express limitation conveyed in the concluding words: "But not for the purpose of continuing the business for which such corporations have been or may be established." 1 How. Ann. St. §§ 4025–4867.

The question now to be adjudged is as to whether the directors thus holding over as trustees, for the purpose of winding up this corporation, were authorized, under the issues involved in this litigation, to charge the assets of the dissolved corporation with the expense of defending the suit instituted and conducted by complainants. It is most obvious, when we read this Michigan statute in the light of the common law, that the powers preserved to the managing officers of this defunct corporation were only such as were reasonably necessary in closing out and winding up the corporate affairs. Did the controversy presented by this litigation involve the corporate interests of the Pewabic Company? A year after the charter of that company had expired by its own limitation, we find the stockholders assembled in due and regular course, on call issued by the directors, of which all proper notice had been given. A large majority of the stockholders wished to continue their capital in a new corporate organization, to which should be conveyed all the property and assets of the defunct company. Their scheme involved the issuance of stock in the new corporation for a like amount of shares in the old, and the assumption by the new entity of the debts of the old. If this scheme had been accept-

able to all of the stockholders, there would have been no legal difficulty in carrying it out. But just here was the difficulty. All were not willing to continue their capital in further prosecution of an enterprise wich had been for some years unremunerative and was wholly speculative. To meet this difficulty, the scheme of the majority placed a valuation of $50,000 upon the entire assets of the old company, and gave to each shareholder the election to take share for share in the old, or to receive a ratable part of $50,000 in full extinguishment of his interest in the surplus of the assets of the old corporation. The vote in favor of this disposition of the corporate property was carried by a majority exceeding two-thirds. The president and secretary were empowered to make the necessary conveyance to the new organization. Against this action, a minority, holding 5,000 shares, protested, and demanded that the property should be publicly sold, for cash, after full notice, and insisted upon this, as the legal right of any stockholder unwilling to assent to the proposed disposition. The protest was unavailing, and the minority filed this bill for the purpose of preventing the proposed disposition of the corporate property, and to procure a public sale thereof. They also sought to have the directors account for their receipts and expenditures in the continuance of the regular business of the corporation after expiration of charter. Thus was presented a controversy between stockholders, as to the relative rights of the majority over the minority in regard to the disposition of the assets of a dissolved corporation. The defunct company had no concern as a corporation in the question thus presented. It was not a question of the continuity of the old corporate life. That was dead beyond resurrection. The plan of the majority involved a new corporation altogether, and a conveyance of the property of the old to the new. The power which the majority claimed in regard to the disposition of the assets of the old company was unsustainable in law or justice. The demand of the minority was the clear law of the case. This was so ruled by the circuit court, and, upon appeal to the supreme court, was fully sustained. Mason v. Mining Co., 25 Fed. 882; Id. 133 U. S. 50, 10 Sup. Ct. 224. These opinions established that, in the absence of an agreement to the contrary, each stockholder had a right to have the corporate property converted into money, by public sale, whether sale was necessary for the payment of debts or not, and that no majority of stockholders, however large, could compel a shareholder in a dissolved corporation to hazard his interest in a new corporation, or accept a valuation arbitrarily fixed by that majority. To this litigation the old corporation was a formal party. It had as a corporation no concern in such a contest between disagreeing stockholders. That it was a litigation between adverse parties of stockholders is clearly stated by Mr. Justice Brewer in delivering the opinion in the second appeal, who said:

"In 1883 the Pewabic Mining Company ceased to exist. Its property then belonged to the different stockholders, as tenants in common. They could not agree among themselves. The minority appealed to the courts, and there the litigation was carried on for years; the minority insisting upon a sale, the

majority upon the transfer of the property to a new corporation. At the end of six years the controversy was finally determined by this court; and in January, 1890, a decree of the circuit court directing a sale was affirmed." Mining Co. v. Mason, 145 U. S. 356, 12 Sup. Ct. 887.

It seems most obvious that the other defendants, who were shareholders acting with the majority and officers and directors endeavoring to obtain judicial sanction for the plan of the majority, were not, by the power conferred upon them by the Michigan statute, authorized to use the corporate assets or credit in employing counsel to represent the contention maintained by the majority shareholders. This disposes of so much of Mr. Talbot's claim as rests upon services rendered in this cause prior to the mandate of the supreme court upon the first appeal, and for services in the quo warranto proceedings reported in Attorney General v. Perkins, 73 Mich. 303, 41 N. W. 426.

The major part of Mr. Talbot's claim is for services rendered after the first appeal had been decided and a mandate sent down. The entire services of the other appellants, whose claims have been grouped, were rendered in this cause after the mandate on the first appeal. This suit had been begun in March, 1884. The first appeal to the supreme court was decided in January, 1890. The learned judge whose opinion is now under review correctly states that that mandate directed the circuit court "to ascertain the debts of the Pewabic Company, and thereupon make an offer of the plant of the company at a public sale; and if no more should be bid than the aggregate of $50,000, and the debts thus ascertained, that the sale should be dropped, and the transfer to the new company, which the majority desired to consummate, should be allowed to proceed. If more than such amount should be bidden, it was directed that the public sale be proceeded with." "This court [still quoting from the same opinion] was further directed to definitely ascertain the debts of the corporation, to require an accounting by the directors of their dealings with the company's assets subsequent to the date of the expiration of its chartered existence, and, upon getting together the whole fund, to make proper distribution thereof." But appellants now contend that, after this mandate came down, a different situation was presented. one which demanded that the defunct corporation, as such, should be represented in the ascertainment of the corporate debts and in all the proceedings in advance of the sale. They insist that the directors, as the representatives of the corporation being wound up, were charged with the duty of protecting the assets against unjust debts and against a premature sale; that it was their duty to see that all the proceedings leading up to the sale were regular, and to do all that was possible to induce competitive bidding. and take every step deemed wise and likely to enhance the ultimate results of a sale; that it was the duty of the officers of the old company to defend any suits which might be instituted through intervention by persons claiming to be creditors of the corporation, and that for this purpose they had a right to retain necessary counsel. That it was the duty of the managers of the

Pewabic Company to defend any and all claims unjustly asserted by intervention or otherwise against that company is quite plain, but it has no practical application here. The special master had, before the first appeal, reported that no debts incurred before this litigation began had been filed, and that all such debts had been paid off by the managers of the Pewabic Company. The claims which he provisionally reported, with a view of fixing an upset price, were all liabilities incurred after this bill was filed. These claims were not resisted by the counsel now asserting claims for services. On the contrary, they were confessed by the Pewabic Company, in so far as that company is represented. With unimportant exceptions, the claims filed with the special master, under the decree upon the mandate, are the very claims now involved in the several appeals under consideration. We do not overlook the fact that one of the counsel so employed did interpose formal defense to the claims of his associates, and to the claims of the other appellants, whose cases will hereafter be referred to. The defenses were, however, never pressed by him, and were inconsistent with the validity of his own claim. The real defense against each and every of the controverted claims has been made by counsel for complainants, and but for them it is evident that no obstacle whatever would have stood between the present appellants and the decrees they severally sought. Neither have we overlooked the further fact that the counsel for the complainants sought to have their compensation charged upon the fund, and that appellants, or some of them, actively resisted the claim thus asserted. It is the right of every beneficiary who is interested in the distribution of a common fund to contest each claim demanding participation. Each is interested in cutting down every other claim, that his own share may be thus enlarged. We do not understand that, for every contest thus made, the contestant establishes a charge upon the common fund. Self-interest is the motive of such defenses, and the resulting enlargement of his own share, in case of success, is the anticipated reward.

We quite agree with the circuit court in the opinion that, when the mandate of the supreme court was received, the real and substantial litigation between the contending factions of stockholders should have been regarded as at an end. Yet it was precisely at this stage of the case that a large addition was made to the counsel who had theretofore appeared for the defendants. Messrs. Cahill & Ostrander, Mr. Baker, Mr. Morse, Mr. Stackpole, and Mr. Hellier now appeared as counsel representing the Pewabic Mining Company. Why this remarkable increase in the number of counsel just when all concerned had every reason to believe that the brunt of the litigation was over is not easily explainable. All of these gentlemen claim to have been regularly retained by the officers and directors of the Pewabic Mining Company. Of this we have no doubt. But did these surviving administrative agents have authority thus to employ counsel at the expense of the assets of the defunct corporation to further carry on the litigation between the disagreeing factions of the stockholders? The rights of the

minority to have the property sold at public sale, for cash, had been clearly vindicated. Six years of hotly-contested litigation had resulted in settling this proposition beyond further controversy. That they were entitled to have as speedy a sale as was consistent with the due and orderly conduct of the suit is most obvious. Notwithstanding this, the record shows that just at this period there began a series of dilatory tactics intended to delay a final sale. Before the special master and in the circuit court, every dilatory objection to be found in the armory of skilled practitioners seems to have been resorted to for the purpose of protracting a final sale. It appears from the record that the special master, Mr. Peter White, was a gentleman exceptionally well qualified for his duties, and entirely competent to advise the court concerning the expediency of a sale. In his provisional report, filed September 18, 1890, he said:

"In my opinion, the mining companies owning contiguous property and a combination of stockholders will be the principal competing bidders at the sale, and that all of these are familiar with the property. I am also of the opinion that, if the property could now be brought to sale, it would be run up by responsible bidders to $500,000 or upward. I find that the present is a more auspicious time for a sale of this property at a good price than has been for years; that inquiries for the day of sale are frequent, and interest in the sale very active; and I am satisfied that the sale should take place at the earliest day on which it can be fixed by the court, so that advantage may be taken of the present condition of the market. I find that the fact that this property is to be sold under the decree in this cause is already widely known among those interested in copper lands, or who are likely to be bidders, in Boston, New York, and Michigan; Boston being the center in this country of copper investments and financial operations."

The exceptions interposed to this provisional report were overruled, and the special master ordered to sell the property, after due advertisement. Twice after it had been advertised, the circuit court, on application of defendants, postponed the sale. At length, on January 24, 1891, a sale was made, at the price of $710,000. Defendants sought to have this bid rejected and the biddings reopened. One Marcus, of questionable financial character, interposed a further bidding, which was countenanced by defendants. The court declined to reopen the biddings, and confirmed the sale. From this decree a second appeal was taken, in the name of the Pewabic Mining Company and of the other defendants, which resulted in an affirmance of the sale. This is reported in 145 U. S. 349, 12 Sup. Ct. 887, et seq.

In the efforts of appellants to postpone the sale, and in their efforts to reopen the biddings, and in their briefs and arguments before the supreme court, it was contended, as they now here insist, that the complainants, from the beginning to the end, were acting in the interest of the Quincy Mining Company, which owned and operated a mining property adjoining the Pewabic property, and in which company the complainants were interested. Upon the other hand, it has been urged that the defendants, since their failure to bring about a transfer of the property to the Pewabic Copper Company, have been acting solely and wholly in the interest of the Franklin Mining Company, which owned a mining property

adjoining that of the Pewabic Mining Company. It has been urged that the Franklin Company and the Pewabic Company have a common management; that many of the directors of the Pewabic Company are likewise officers and directors of the Franklin Mining Company; and that the defendants, in interposing obstacles to an early sale, and in attempting to open the biddings, had no other object than to secure the property to the Franklin Company on account of their interest therein. The special master, Mr. White, who was intimately acquainted with the entire history of this litigation, reported adversely to each and every of the claims now under consideration, upon the ground, among others, that the "said services were rendered and said expense incurred for and in behalf of interests adverse to the general body of stockholders and creditors of the Pewabic Mining Company," and "were rendered and had in said cause in behalf of the defeated parties in the various branches of the litigation therein, and that all of the said services rendered at other stages of the litigation were adverse to the best interest of the estate of the Pewabic Mining Company, including the postponement of the sale."

An examination of the entire record leads us to concur in the observations of Judge Severens, the judge who presided in this cause in all its stages after the first mandate, who, speaking of this report of the special master, said:

"It was proper for the master to take into account the general nature of the case, and all the facts and circumstances connected with it which had transpired subsequent to his appointment and under his cognizance. He knew that the contending parties were interested in two great rival mining companies, who were struggling to get control of the Pewabic Mine, and he had sufficient reason for believing that the litigants were respectively striving to carry the property into their favored camp. He knew that, as soon as it was determined that a public sale was to be made of the mine except in a contingency which was very certain not to happen, a large number of additional counsel was brought into the defense, and a series of dilatory tactics adopted, which he might reasonably believe were in the interests of other parties than the Pewabic Mining Company. The financial condition of the Franklin Company was not then such as to enable it to meet the sale. It was making efforts to prepare itself. Mr. S. L. Smith, one of its directors, was on the ground in Michigan, professing to act as agent for the Pewabic Company (by what authority does not appear), and co-operating with the counsel in the dilatory proceedings which were being taken. It is said by one of the Michigan counsel that he was employed by two other counsel specially to appear for the Pewabic Company, and defend its interests as distinct from those of the directors, and that said Smith paid him money, and promised he should be further paid for his services. What the need of this was if all the counsel already in the case were employed for that purpose it may have troubled the master to comprehend. And the detail of the proceedings had before him for the purpose of his former report, as well as of those upon which the present report is founded, shows clear indications which might be regarded by him as strengthening the belief that the defense was not conducted primarily in the interest of the Pewabic Mining Company. Among others of this sort, he must have observed that the large claim against the Pewabic Company presented by the Franklin Mining Company was during both his investigations promoted by counsel for the defense. It was on their motion and their appearance for the Franklin Company, and for the convenience of that and other claimants, that the master adjourned his hearing from Marquette to Boston, and a long trip, at considerable expense to the fund, was undertaken. None of the counsel for the defense acted for the Pewabic Company there, but some of them assisted in the presentation of the claims of the Franklin Com-

pany and others. Indeed, from first to last that company has had no other
counsel to represent it in the prosecution of the claim. They allege excep-
tions against the action of the master exonerating the Pewabic Company from
the claim of the Franklin Company. It is true that one of them, in the
name of that company, filed objections to the allowance of the claims of the
Franklin Company and others during the proceedings prior to the sale; those
objections consisting of a proposition of law that, the Pewabic Company be-
ing extinct, it had no legal capacity to incur the debt,—a proposition which
they have always contended is wholly untenable,—and of a denial of liability
to the extent claimed. No step was taken by them to maintain either ground.
The master may not unreasonably have concluded that the filing of those ob-
jections was a part of the action taken to protract the litigation and post-
pone the sale. It was then strenuously insisted that all the claims should be
definitely passed upon before the sale. None of the measures adopted in the
name of the Pewabic Company is any more easily referable to its real defense
than to the object which all the appearances indicated. If it be said that,
after the sale was finally confirmed, the counsel had more liberty of action,
the answer would be that there was nothing to show to the master that there
had been any change of relation. The point was made on the argument of
these exceptions that, whatever the motive of their employers, if those em-
ployers stood in such legal relation to the company as authorized them to con-
tract in its name, the counsel were not bound to investigate their private
purposes. But I think the master may properly have held that it would be
imputed to them that they should have known what was apparent to all oth-
ers having to do with the case, and that their employment for the purpose
intended, at the expense of the Pewabic Company, would be a breach of trust.
It ought rather to be implied that they undertook in the name of the corpora-
tion, by means which were permissible by the practice of the court, and not
injurious to the corporation, to accomplish the objects their employers had in
view. It is right to say that the master does not report that the Pewabic
Company has suffered any prejudice from what has been done in its name,
or that the counsel contemplated any such results; and I feel bound to say
in justice to them that no such prejudice has happened, and that there is no
ground of imputing to them that they anticipated it was likely to happen;
for while, in a legal point of view, the protraction of the litigation for the
purpose indicated was not justifiable, the accidents of the situation were such
that the real injury happened. The development of the adjacent mines demon-
strated the value of the Pewabic, and the contention of the rivals carried the
price at the sale up to a figure not thought of in the beginning. These facts
are referred to because they were the incidents of the defense from the time
when the case first came back from the supreme court to the second con-
firmance of the court,—a period covering almost the whole of these claims,—
for the purpose of demonstrating the conclusion that the services rendered
were not to the Pewabic Company, but in the interest of the Franklin
Company and those affiliated with it. Under these circumstances, the ques-
tion recurs whether it is equitable that these complainants should be com-
pelled to help pay for conducting the defense during that period. The master
thinks not, and I agree with him."

With respect to the purposes and motives actuating the parties
after the first appeal, Mr. Justice Brewer said, in delivering the
opinion of the court on the second appeal:

"It is insisted by defendant that the plaintiffs were acting in the interest of
the Quincy Mining Company, a corporation owning adjoining and rival min-
ing property; that solely in its interest, and not for the benefit of the stock-
holders in the Pewabic Mining Company, they carried on this litigation, se-
cured the sale, bought at it, and, in final consummation of the wrong to their
co-owners, have, since their purchase, conveyed the property to the Quincy
Mining Company. There is a counter charge by the appellees that the ma-
jority of the stockholders who sought to convey the property to the new cor-
poration, and who have been practically the adverse party in this litigation,
and who may hereafter be considered as described by the defendant, were
acting in the interest of the Franklin Mining Company, another corporation,

also owning property adjacent to the Pewabic Mine. We are inclined to think there is truth in each allegation, and that it is not difficult to read between the lines that the minority of the stockholders were interested in the Quincy and the majority in the Franklin Company, and that these respective corporations were seeking to obtain possession and control of the Pewabic. But there was no wrong or fraud in this, and no deception. Each party evidently knew the interests and relations of the other. In the answer originally filed by the defendant, in 1884, it was charged upon the plaintiffs that they were acting in the interest of a rival mining company." Mining Co. v. Mason, 145 U. S. 357, 358, 12 Sup. Ct. 887.

As to the contention of appellants that their services in procuring the two short postponements of sale were advantageous to the interests of the shareholders, and therefore were services for which the directors might contract and obligate the assets of the Pewabic Mining Company, it is sufficient to say that it by no means follows that the price ultimately obtained was a consequence of such postponement. We are entirely satisfied that the enhanced price was one of the accidents of the litigation, and that the efforts of appellants to delay the sale were rendered in the interest of the Franklin Mining Company, which desired delay for its own purposes. Our conclusion is that there is no error in the decree appealed from in so far as it is involved by the six appeals we have been considering. For compensation, appellants must look to the interests they really represented, and cannot rely upon any contract between themselves and the defunct Pewabic Mining Company as a means of reaching the fund in court.

As heretofore stated, four of appellants filed petitions asking an allowance out of the fund for services rendered to the fund by the dilatory proceedings heretofore recounted. It is unnecessary to say more than that the reasons heretofore given with respect to the same claims asserted against the Pewabic Mining Company apply in full force to the claims asserted against the fund.

The next appeal to be considered is that of Thomas H. Perkins, who presented a claim for $5,000, for his services as president of the Pewabic Mining Company, after its legal dissolution. That company had never paid any salary to its president, and Mr. Perkins had no contract or agreement for such compensation. He was one of the defendants, as a director in both the old and new companies, and was one of the parties responsible for the employment of the additional counsel after the first mandate, and for the dilatory proceedings then instituted. We know of no ground upon which his claim should be sustained.

The appeal of Daniel L. Demmon, who presents a claim for $14,208.33, for services as secretary and treasurer of the Pewabic Mining Company, must be disallowed. The reasons given by the circuit court are full and satisfactory, and need not be here repeated.

The last appeal to be considered is that of the Franklin Mining Company, which presented a claim aggregating $42,240.54. The claim is for money loaned the Pewabic Mining Company after this litigation began. The master reported against this claim, and his report was confirmed, though not upon all the grounds stated in the master's report. The directors, after the expiration of the charter life, had no general power to borrow money or execute notes. Cir-

cumstances might be shown which would justify the borrowing of money, and make the loan a charge upon the corporate assets. This money was borrowed by Daniel L. Demmon, secretary and treasurer of the Pewabic Mining Company, by authority of a resolution of the directors. Demmon was also secretary and treasurer of the Franklin Company, and seems to have represented the lender as well as the borrower in the transaction. Under these circumstances, the lending company is fully chargeable with a knowledge of all the facts which operated as a limitation upon the power of the borrower to obligate its assets for a repayment of such a loan. Demmon claims that the money was borrowed to redeem certain Pewabic property from execution sale. His evidence only goes to show that the judgments paid off aggregated less than $17,000, which was the amount of the first loan. How the rest of the money was applied is most uncertain. The liability of the Pewabic Company for money borrowed after its corporate existence had ceased depends upon the necessity which existed and the object of the loan. This directory had continued the ordinary mining operations of this corporation for a year after all authority to continue business had ceased. For their receipts and expenditures they are liable to an account with complainants, and such an accounting has been ordered. It may be that their business operations thus conducted gave rise to the necessity for borrowing money, and, if so, a question will arise as to the liability of the company for debts contracted while doing such business or its liability for money borrowed to pay debts which were created before expiration of charter, and which should have been paid out of the means expended in carrying on the regular operations of the corporation after all power to do so had ceased. There is much evidence tending to show that the Franklin and Pewabic Companies were under the management and control of the same men, and that the Franklin Company was largely the beneficiary of this management, and liable to an account for its use of Pewabic property, machinery, and labor for its own benefit. These matters appear, but are not offered as a set-off in any regular way. These facts had much effect upon the master and upon the judge who confirmed the master's report, in leading to the conclusion that in justice nothing was due to the Franklin Company. We are not satisfied to reject this claim entirely, upon the showing made on this record. The account with the defendant directors should be stated, that the court may see what was done with the personal assets mentioned in the reports of 1883 and 1884, made by the board to the shareholders. The real state of the finances of the company should be fully shown, and the actual use to which this money was put should be more clearly made to appear. The dealings between the Franklin and Pewabic Companies should be probed, and an account stated between them. Then if it appear that this money was borrowed and used to save the assets of the Pewabic, or to pay its just and legal liabilities, and that there were no funds subject to the control of the directors to meet such liabilities or redeem its assets, it should be paid, or such part of it as may be due on a balancing of accounts. The basis of any recovery

by the Franklin Company must be the true balance upon a full showing that such balance was necessary to preserve the Pewabic property, or pay its just legal liabilities.

The appeal of the Franklin Company is sustained, and the decree as to it reversed. The cause as to the claim of the Franklin Company will be remanded, and the claim be referred to the special master, with proper directions for a report. In all other respects the decree as involved in the other appeals is affirmed.