JOHN BACON AND THOMAS ROBINS, SURVIVING TRUSTEES OF THE
BANK OF THE UNITED STATES, WILLIAM R. WHITE AND
JOHN HOOPER, CITIZENS OF PENNSYLVANIA, LEWIS PHŒNIX
AND JOHN D. BEERS, CITIZENS OF NEW YORK, STOCKHOLD-
ERS OF THE LATE COMMERCIAL BANK OF NATCHEZ, WHO SUE
ON BEHALF OF THEMSELVES AND ALL OTHER STOCKHOLDERS OF
SAID LATE COMMERCIAL BANK OF NATCHEZ, WHO ARE CITI-
ZENS OF OTHER STATES THAN MISSISSIPPI, WHO SHALL COME
IN AND SEEK RELIEF BY, AND CONTRIBUTE TO THE EXPENSES
OF THIS SUIT, COMPLAINANTS AND APPELLANTS, *v.* WILLIAM
ROBERTSON, PHILIP HOGGATT, HENRY CHOTARD, AND JOHN F.
GILLESPIE, AND OTHERS, (NAMES UNKNOWN,) STOCKHOLDERS OF
THE LATE COMMERCIAL BANK OF NATCHEZ, AND CITIZENS OF
THE STATE OF MISSISSIPPI.

In the State of Mississippi, a judgment of forfeiture was rendered against the Com-
mercial Bank of Natchez, and a trustee was appointed to take charge of the books
and assets of the bank.
Under the laws of Mississippi and the general principles of equity jurisprudence, the
surplus of the assets which may remain after the payment of debts and expenses,
belongs to the stockholders of the bank.
The early and late English cases examined, as to what becomes of the property of a
corporation whose charter has been forfeited by a judicial sentence.
The modern rules of the English courts have been adopted in the United States,
extending the protection of chancery over the civil rights of members of moneyed
corporations, and recognizing the existence of distinct and individual rights in their
capital and business.
The trustee is estopped from denying the title of the stockholders to a distribution.
The courts of the United States have jurisdiction over the case, and a bill can be
maintained, filed by a number of stockholders owning one fifth part of the capital
stock, suing for themselves and such of the stockholders as were not citizens of
Mississippi, nor defendants in the bill.

THIS was an appeal from the circuit court of the United
States for the southern district of Mississippi.

The transaction to which the suit relates was partly and inci-
dentally brought before the notice of this court in 16 How. 106.

The facts are stated in the opinion of the court.

It was argued by *Mr. Wharton* and *Mr. Yerger*, for the appel-
ants, and *Mr. Lawrence*, for the appellees.

Mr. Justice CAMPBELL delivered the opinion of the court.

This bill was filed in the circuit court against William Robert-
son, a trustee, appointed to liquidate the affairs of the late
Commercial Bank of Natchez, Mississippi, and such of the
stockholders of the bank as are citizens of that State, and is
prosecuted by a number of stockholders, owning one fifth part
of the capital stock, for themselves, and such of the stockhold-
ers as are not citizens of Mississippi, or defendants in the bill.

The Commercial Bank was incorporated and organized under enactments of the legislature in 1836, with a capital of $3,050,-000, divided into shares of $100 each, which are now distributed among two hundred and eighty persons.

The corporation carried on the business of banking through the agency of presidents, directors, cashiers, and other officers, at Natchez, and four other towns of Mississippi, for a number of years. During this time there was a temporary suspension of specie payments, which the bill avers to have been accidental, and to have formed the only ground for the proceedings taken against the corporation. In June, 1845, the circuit court of Adams county rendered a judgment against the bank, upon an information in the nature of a *quo warranto* preferred pursuant to the act of the legislature of July, 1843. By this judgment the bank was " prejudged and excluded from further holding or exercising the liberties, privileges, and franchises granted by the said charter;" " the liberties, privileges, and franchises granted to the bank were seized" by the State; the " property, books, and assets of the bank" were adjudged to be seized and delivered to a trustee, who might have execution therefor. William Robertson was appointed that trustee "to take charge of the books and assets of the bank." His duties are declared, conformably to the act of 1843, which will be considered in another part of this opinion.

The bank appealed from this judgment, and in the spring session of the high court of errors and appeals, in 1846, it was affirmed. William Robertson entered upon the office of trustee in July, 1846. He took possession of money, stocks, evidences of debt, and real estate having a nominal value of near four millions of dollars, and continues to hold them, except in so far as he has applied them to the payment of the charges of the trust, and the debts of the corporation. The bill alleges that all the debts have been paid, and that only a small sum is due for costs, and that property of great value, consisting of money, stocks, evidences of debt, bonds, and personalty, remains with the trustee, who refuses to account for them to the stockholders. The object of the bill is to establish the title of the stockholders to this surplus, and to obtain the ratable shares of such of them as are able and willing to join as plaintiffs in this suit. The bill names a number of the stockholders as parties, and is fitted to embrace all by the representation of these.

The defendants joined in a general demurrer to the bill; a decree of dismissal was rendered at the hearing at the circuit, and, by appeal, was taken up to this court to revise that decision.

When the defendant, Robertson, assumed the office of trustee, his duties were defined by two acts of the legislature of Mississippi. The act of July, 1843, directed the institution of suits against such of the banking corporations of the State as had violated their charters in such a manner as to incur their forfeiture, and prescribed the form of the suits for the enforcement of that forfeiture. It enacted " that upon a judgment of forfeiture against any bank, the debtors of the bank shall not be released from their debts and liabilities to the same ; but it was made the duty of the circuit court, rendering the said judgment, to appoint one or more trustees to take charge of the books and assets of the banks ; who should sue for and collect all debts due such bank, and sell and dispose of all property owned by it, or held by others for its use ; and the proceeds of the debts, when collected, and of the property when sold, to apply, as may hereafter be directed by law, to the payment of the debts of such bank. The trustee was made subject to a criminal prosecution for embezzlement, conversion of the trust property, as a failure to account for it according to law; and both acts prescribed a bond to be given to secure the faithful performance of his duty. The act of February, 1846, amended and enlarged the scope of the act of 1843, and was applicable to all trustees appointed under either.

This act provided a summary remedy in favor of the trustee to obtain the control of the corporate property; for an inventory to be made to the first court, after his appointment; for an order of sale of all the corporate property at auction, for cash, after a notice of ninety days, at specified places ; for commissioners to audit the claims against the banks, and for their presentation to these commissioners ; for early decisions upon the exceptions to their report; for a final decree of distribution, first, in the payment of expenses, then public dues, costs, and fees, the debts reported, and, lastly, " the surplus, if any shall be ratably distributed among the stockholders." There was a provision that the bills of the bank should be receivable for debts, and that the debtor might redeem from any purchaser of his debt or obligation, (so sold,) during two years, by paying the purchase-money, all costs, and twelve and a half per cent. interest. The object of the two statutes can hardly be misconceived. They are parts of a system, the latter act being auxiliary to, and adopted in aid of, the provisions of the earlier act of 1843—the two acts containing the full expression of the will of the legislature. The circumstances of the legislature enabled it to defer the promulgation of its entire policy until the year 1846. The exigencies of the State were entirely answered by the directions given in 1843 to the executive officers to take

initiatory measures for placing these corporations under restraint, and for the security of their property. To effectuate these, involved delay and litigation, and the legislature might well await their issue, before unfolding their whole plan of liquidation and settlement. The two statutes which embody it have formed the subject of much discussion in the courts of Mississippi, and difficulty has been experienced there in carrying them into execution. No suit has been instituted there by the stockholders, though their rights have been incidentally debated, both at the bar and by the supreme appellate court. To comprehend the import of this legislation, we must consider the mischiefs it was designed to prevent or remove, and the mode adopted to accomplish the end; for the legislation is of a character wholly remedial. The common law of Great Britain was deficient in supplying the instrumentalities for a speedy and just settlement of the affairs of an insolvent corporation whose charter had been forfeited by a judicial sentence. The opinion usually expressed as to the effect of such a sentence was unsatisfactory and questioned. There had been instances in Great Britain of the dissolution of public or ecclesiastical corporations by the exertion of the public authority, or as a consequence of the death of their members, and parliament and the courts had affirmed in these instances that the endowments they had received from the prince or pious founders would revert in such a case. Stat. de terris Templariorum, 17 Edw. II. ; Dean and Canons of Windsor, Godb. 211 ; Johnson v. Norway, Winch. 37 ; Owen, 73 ; 6 Vin. Abr. 280. What was to become of their personal estate and of their debts and credits had not been settled in any adjudged case, and as was said by Pollexfen in the argument of the *quo warranto* against the city of London, was perhaps " *non definitur in jure.*" Solicitor Finch, who argued for the crown in that cause, admitted, " I do not find any judgment in a *quo warranto* of a corporation being forfeited." Treby, on behalf of the city, said, " the dissolving a corporation by a judgment in law, as is here sought, I believe is a thing that never came within the compass of any man's imagination till now; no, not so much as in the putting of a case. For in all my search, (and upon this occasion I have bestowed a great deal of time in searching,) I cannot find that it ever so much as entered into the conception of any man before; and I am the more confirmed in it because so learned a gentleman as Mr. Solicitor has not cited any one such case wherein it has been (I do not say adjudged but) even so much as questioned or attempted ; and, therefore, I may very boldly call this a case *primæ impressionis.*" The argument of Pollexfen was equally positive. The power of courts to adjudge a forfeiture so as to dissolve a corporation

was affirmed in that case, but the effect of that judgment was not illustrated by any execution, and the courts were relieved from their embarrassment by an act of parliament annulling it. Smith's case, 4 Mod. 53; Skin. 310; 8 St. Tri. 1042, 1057, 1283. Nor have the discussions since the Revolution extended our knowledge upon this intricate subject. The case of Rex *v.* The Amery, 2 D. & E. 515, has exerted much influence upon text writers. The questions were, whether a judgment of seizure *quousque* upon a default was final, and if so, whether the king's grant of pardon and restitution would overreach and defeat a charter granting to a new body of men the same liberties intermediate the seizure and the pardon. The king's bench, relying upon the Year-book of 15 Edw. IV., declared the judgment to be final and the new charter irrepealable. But the House of Lords reversed the judgment. The judges, upon an examination of the original roll of the case in the Year-book, discovered that it did not support the conclusion drawn from it, and Chief Baron Eyre says, " that Lord Coke had adopted the doctrine too hastily." The discussions upon this case show how much the knowledge of the writ of *quo warranto* as it had been used and applied under the Plantagenets and Tudors, had gone from the memories of courts and lawyers. 4 D. & E. 122, Tan. on Quo Warranto, 24. In Colchester *v.* Seaber, 3 Bur. 1866, where the suit was upon a bond, and the defence was, that certain facts had occurred to dissolve the corporation, and that the creditor's claim was extinguished on the bond, Lord Mansfield said, " without an express authority, so strong as not to be gotten over, we ought not to determine a case so much against reason as that parliament should be obliged to interfere." The question occurs here, could parliament interfere? And the answer would be by their authorizing a suit to be brought notwithstanding the dissolution. These are all cases of municipal corporations where the corporations had no rights in the property of the corporation in severalty. The courts of Westminster have found much difficulty in applying the principles settled in regard to such, to the commercial and trading corporations that have come into existence during this century. The courts there within the last twelve months have been troubled to discuss whether a commercial corporation could recover damages for the breach of a parol contract, or whether the contract should have had a seal to make it valid. Austra. R. M. N. Co. *v.* Marzetti, 32 L. & E. 572; 3 Ib. 420. It may be admitted that the courts of law could not give any relief to the shareholders of a corporation disfranchised by a judicial sentence in respect to a corporate right. Their modes of proceeding do not provide for the case as they have not for many others. 1 Plow. 276, 277;

Richards v. Richards, 2 B. & Adol. 447; Will. Ex. 1129. But this concession does not involve an acknowledgment that the rights of the corporations are extinguished. Courts of chancery have been forced into a closer contact with these associations, and have formed a more rational conception of their constitution and a more accurate estimate of their importance to the industrial relations of society. Those courts have evinced a spirit of accommodation of their modes of proceeding so as to adapt them to the changing exigencies of society. Lord Cottenham, in Wallworth v. Holt, 4 M. & C. 635, in reference to the conduct of suits in which similar associations were concerned, said : " I think it is the duty of this court to adapt its practice and course of proceeding to the existing state of society, and not, by too strict an adherence to rules and forms established under different circumstances, to decline to administer justice and to enforce rights for which there is no other remedy." In the same spirit, Sir James Wigram, V. C., observes : " Corporations of this kind are in truth little more than private partnerships; and in cases which may be easily suggested, it would be too much to hold that a society of private persons associated together in undertakings which, though certainly beneficial to the public, are nevertheless matters of private property, are to be deprived of their civil rights inter se, because, in order to make their common objects more attainable, the crown or legislature have conferred upon them the benefit of a corporate character." Foss v. Harbottle, 2 Hare, 491. These just views which have afforded to wise chancellors a sufficient motive to enlarge the scope and relax the rigor of the rules of chancery proceeding, so as to bring the civil rights of individuals in whatever form they may exist, or however complicated or ramified, under the protection of legitimate judicial administration, have been adopted in the United States, not simply for the improvement of methods of proceeding, but also for the adjustment of rights and the assertion of responsibilities among the members of such associations. In the Bank of the United States v. Deveaux, 5 Cr. 61, this court held " that the technical definition of a corporation does not uniformly circumscribe its capacities, but that courts for legitimate purposes will contemplate it more substantially; and the court in that case allowed the corporation to use its corporate name for the purposes of suit in the courts of the United States to represent the civil capacities of the persons who composed it. So the court has held that corporate acts need not to be evinced by writing, nor corporate contracts by a common seal; that corporations are liable on contracts made or defaults or torts committed by their officers or agents in the course of their employment. 12 Wheat.

41 *

40; Ib. 64; 6 How. 344; 14 Ib. 468.   In Lennox *v.* Roberts, 2 Wheat. 373, the court gave effect to a general assignment of a corporation of its *choses in action* made in anticipation of the expiration of its charter, and which was designed to preserve to the corporators their rights of property.   In the Mumma *v.* Potomac Company, 8 Pet. 281, it held that the assignment of all the property of a corporation and the surrender and cancellation of its charter with the consent of the legislature, did not defeat the right of the judgment creditor to satisfaction out of the property which had belonged to it.   The power of courts of equity in cases like these was recognized as adequate to maintain the rights of the parties beneficially interested, and this doctrine was repeated and developed in Curran *v.* Arkansas, 15 How. 304.

The tendency of the discussions and judgments of the court of chancery in Great Britain, and of the courts of this country, is to concede the existence of a distinct and positive right of property in the individuals composing the corporation, in its capital and business, which is subject in the main to the management and control of the corporation itself; but that cases may arise where the corporators may assert not only their own rights, but the rights of the corporate body.   And no reason can be given why the dissolution of a corporation, whether by judicial sentence or otherwise, whose capital was contributed by shareholders, for a lawful and perhaps laudable enterprise, with the consent of the legislature, should suspend the operation of these principles, or hinder the effective interference of the court of chancery for the preservation of individual rights of property in such a case.   The withdrawal of the charter—that is, the right to use the corporate name for the purposes of suits before the ordinary tribunals—is such a substantial impediment to the prosecution of the rights of the parties interested, whether creditors or debtors, as would authorize equitable interposition in their behalf, within the doctrine of chancery precedents. Stainton *v.* The Carron Company, 23 L. and E., 315; Travis *v.* Milne, 9 Hare, 141; 2 Ib. 491.   For the sentence of forfeiture does not attain the rights of property of the corporators or corporation, for then the State would appropriate it.   If those rights are put an end to, it would seem to be rather from a careless disregard, or hardened and reckless indifference to consequences, on the part of the public authority, than from any preconceived plan or purpose.   For, according to the doctrine of the text writers on this subject, the consequences are visited without any discrimination; the losses are imposed upon those who are not blameworthy, and the benefits are accumulated upon those who are without desert.   The effects of a dissolu-

tion of a corporation are usually described to be, the reversion of the lands to those who had granted them; the extinguishment of the debts, either to or from the corporate body, so that they are not a charge nor a benefit to the members. The instances which support the *dictum* in reference to the lands, consist of the statutes and judgments which followed the suppression of the military and religious orders of knights, and whose lands returned to those who had granted them, and did not fall to the king as an escheat; or of cases of dissolution of monasteries and other ecclesiastical foundations, upon the death of all their members; or of donations to public bodies, such as a mayor and commonalty. But such cases afford no analogy to that before us. The acquisitions of real property by a trading corporation are commonly made upon a bargain and sale, for a full consideration, and without conditions in the deed; and no conditions are implied in law in reference to such conveyances. The vendor has no interest in the appropriation of the property to any specific object, nor any reversion, where the succession fails. If the statement of the consequences of a dissolution upon the debts and credits of the corporation is literally taken, there can be no objection to it. The members cannot recover nor be charged with them, in their natural capacities, in a court of law. But this does not solve the difficulty. The question is, has the *bonâ fide* and just creditor of a corporation, dissolved under a judicial sentence for a breach in its charter, any claim upon the corporate property for the satisfaction of his debt, apart from the reservation in the act of the legislature which directed the prosecution? Can the lands be resumed in disregard of their rights by vendors, who have received a full payment of their price, and executed an absolute conveyance? Can the careless, improvident, or faithless debtor, plead the extinction of his debt, or of the creditor's claim, and thus receive protection in his delinquency? The creditor is blameless—he has not participated in the corporate mismanagement, nor procured the judicial sentence; he has trusted upon visible property acquired by the corporation, in virtue of its legislative sanction. How can the vendors of the lands or the delinquent debtors resist the might of his equity? But, if the claims of the creditor are irresistible, those of the stockholder are not inferior, at least against the parties who claim to hold the corporate property. The money, evidences of debt, lands, and personalty acquired by the corporation, were purchased with the capital they lawfully contributed to a legitimate enterprise, conducted under the legislative authority. The enterprise has failed under circumstances, it may well be, which entitle the State to withdraw its special support and encouragement; but

the State does not affirm that any cause for the confiscation of the property, or for the infliction of a heavier penalty, has arisen. It is a case, therefore, in which courts of chancery, upon their well-settled principles, would aid the parties to realize the property belonging to the corporation, and compel its application to the satisfaction of the demands which legitimately rest upon it.

In our view of the equity of this bill we have the support and sanction of the legislature of Mississippi. Their legislation excludes all the consequences which have been imputed as necessary to a sentence of dissolution on a civil corporation. From the plenitude of their powers, for the amelioration of the condition of the body politic, and the supply of defects in their system of remedial laws, they have afforded a plan for the liquidation and settlement of the business of these corporations in which the equities of the creditors and shareholders respectively are recognized, as attaching to all the corporate property of whatever description. And the inquiry arises, who is authorized to obstruct the enforcement of these equities in so far as the stockholders of the Commercial Bank of Natchez are concerned? The creditors have been satisfied. The defendant in the present suit is the trustee appointed under these legislative enactments. His demurrer confesses that he has received money, stocks, evidences of debt, lands, and personal property, which he refuses to distribute. He claims that the stockholders have no rights since the dissolution of the corporation, and if any, they must be looked for in the circuit court of Adams county, Mississippi. But the trustee cannot deny the title of the stockholders to a distribution. To collect and distribute the property of the corporation among the creditors and stockholders, is his commission—for this end he was placed in the possession of the property, and was armed with all the powers he has exercised.

His title is in subordination to theirs, and his duties are to maintain their rights and to consult their advantage. Pearson *v.* Lindley, 2 Ju. 758; 3 Pet. 43; 4 Bligh. 1; Willis Trus. 125, 172, 173. He is estopped from making the defence of a want of title in the stockholders. Nor is the objection to the jurisdiction of this court tenable. Ten years have nearly elapsed since this trust was created. The acts of the legislature contemplated a prompt and speedy settlement. They direct the reduction of all the property into ready money, and an early distribution among the parties concerned. The trustee confesses that he has not sold the lands nor personal estate, and that he has refused to distribute the money. He has committed a palpable breach of trust, according to the case made by the bill and as confessed by the demurrer. All the other trusts having been

fulfilled, the stockholders are entitled to such an administration as will be most beneficial to them, or to a sale of the trust property in the manner prescribed by the statute of Mississippi. Nor is the objection to the form of the suit tenable. If the trust estate had been liquidated and the interests of the stockholders ascertained, any stockholder might have maintained a suit for his aliquot share without including any other stockholder. Smith v. Snow, 3 Mad. C. R. 310. But the trust estate has not been sold, nor are the names of all the stockholders ascertained, the trustee is called on to account, and the bill asks for the collection and disposal of the remaining property under the authority of the court of chancery.

The stockholders are interested in these questions, and are then proper parties to the bill. The number of the parties renders it impracticable to bring all before the court, and therefore the suit may be prosecuted in the form which has been employed in this suit. This court sustained such a bill in the case of Smith v. Swormstedt, 16 How. 288.

We do not intend to decide any of the questions of the cause which may arise as to the mode of administering the relief prayed for in this bill. Our opinion is that the plaintiffs have shown a proper case for equitable interposition by the circuit court, and that the decree of that court dismissing the bill is erroneous.

Decree reversed, and cause remanded.