A. R. BARNES & CO. et al. v. BERRY et al.

(Circuit Court of Appeals, Sixth Circuit. March 16, 1909.)

No. 1,810.

ASSOCIATIONS (§ 18*)—CONTRACT BY VOLUNTARY ASSOCIATION—AUTHORITY OF
OFFICERS.

The so-called contract between the International Printing Pressmen and
Assistants' Union and the United Typothetæ of America, signed by the
directors of each of such associations on January 8, 1907, for the purpose
of governing the relations between the members of the two as employers
and employés, is invalid and not binding for want of authority on the part
of the directors of the Union to execute the same. It was designed to
take the place of a prior agreement between the parties which was to
expire by limitation May 1, 1907, but contained certain provisions differ-
ing therefrom. Such prior contract had been similarly negotiated, subject
to ratification by each association, and had been so ratified. The new
agreement was also ratified by the Typothetæ, but the directors of the
Union assumed to have authority to conclude the contract. The minutes
of the last preceding convention of the association at which their au-
thority was given show, however, that their negotiations as to some of
the matters covered by the agreement were to be reported to the next
annual convention for its action, and such convention, which met in June
following, voted to ratify the contract only subject to certain changes,
which were never made.

[Ed. Note.—For other cases, see Associations, Dec. Dig. § 18.*]

Appeal from the Circuit Court of the United States for the South-
ern District of Ohio.

For opinion below, see 157 Fed. 883.

Henry Spalding and Dudley Taylor, for appellants.

E. G. Kinkead, for appellees.

Before LURTON and SEVERENS, Circuit Judges, and COCH-
RAN, District Judge.

COCHRAN, District Judge. This case has to do with a controversy
between certain employers on the one hand and certain employés on
the other. The employers are master printers engaged in business in
the principal cities of the United States and Canada. They are either
corporations, firms, or individual natural persons. Those in each city
are organized into local associations. Each local association has its
own distinct name, consisting of the word "Typothetæ" preceded by
the name of the city where located, as, e. g., the "St. Louis Typothetæ."
These several local associations are organized into an international
association, which has the name of the "United Typothetæ of Amer-
ica." The local associations are made up of the individual master
printers of the city where located, and the international association is
made up of the individual local associations. The local associations
send delegates to an annual meeting of the international association,
and these delegates at those meetings, amongst other business trans-
acted thereat, elect the officers thereof to represent the association dur-
ing the ensuing year. All the master printers of the two countries
are not in the organization. Many are not.

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes
169 F.—15

The employés are pressmen and feeders and other assistants of the pressmen. They are all individual natural persons. They are located and organized as are the master printers. The pressmen and the feeders and other assistants of the pressmen, however, are separately organized so far as the local associations are concerned; the local associations of both being organized into one and the same international association. The local associations of each have their own distinct names; that in the case of the pressmen consisting of the words "Printing Pressmen's Union," preceded by the name of the city where located and followed by its particular number, as, e. g., "St. Louis Printing Pressmen's Union, No. 6," and in the case of the feeders and assistants of the words "Feeders' & Assistants' Union," preceded and followed as in the case of the pressmen, as, e. g., "St. Louis Feeders' & Assistants' Union, No. 43." The name of the international association is the "International Printing Pressmen and Assistants' Union." The local associations of both send delegates to an annual meeting of the international association, who elect officers to represent it during the succeeding year. All the pressmen and feeders and other assistants are not in this organization. Many are not. It seems that all union employés of this kind are not in it.

All the master printers belonging to the Typothetæ do not have in their employ pressmen and feeders and other assistants of the Printing Pressmen & Feeders' Union. Nor are all such employés in the employ of the master printers of the Typothetæ. Many such employers have no such employés in their employ, and many of such employés are not in the employ of any such employers. But to a large extent such employers have such employés in their employ. The officers of each international association are five in number, a president, three vice presidents, first, second, and third, and a secretary and treasurer, and these five constitute the board of directors of the association. At least this is the case with the Union, and we will treat it as so in the case of the Typothetæ.

All of the members of the Union do not approve of the controversy with which this suit has to do. A large number of them, though less than a majority, it would seem, do not approve of it. The suit was brought by 11 master printers belonging to the Typothetæ located in the cities of Chicago, St. Louis, New York, and Boston, on behalf of themselves and all the other members of the Typothetæ not citizens of Ohio, appellants here, against the president and the secretary and treasurer of the Union, citizens of Ohio and resident in the city of Cincinnati, appellees here. Those officials were sued, not in their official capacity, but in their individual. They were sued, however, because of their official position. The relief sought was an injunction against action on their part calculated to bring about a breach of a written contract alleged to have been entered into by the two international associations January 8, 1907. According to appellants' counsel, the nature of the relief sought was an injunction against the threatened violation of a negative covenant therein. The controversy which occasioned the suit involved two matters. One was as to whether there was any such contract between the two international associations.

The other was whether, if there was such a contract, the appellants were entitled to the relief they sought. The lower court held against the appellants as to both particulars and dismissed the bill.

Preliminary to setting forth the terms of the alleged contract certain other matters should be stated. The local associations of each organization alone had jurisdiction of the scale of wages to be paid by the employer to the employé. Neither international association had anything to do with either. The latter have jurisdiction of disputes between the local associations, of the hours of labor, and of lockouts, strikes, and boycotts. It is not entirely clear which has jurisdiction of shop practices. Neither of the international nor any of the local associations have anything to do with the fact or length of employment of the employé by the employer. That is a matter between each individual employer and each individual employé.

The contract referred to covered matters within the jurisdiction of the two international associations. It is not necessary to set it forth verbatim. Three pages of the printed record are taken to set it forth. It covered three main matters. It provided that disputes between local associations should be settled first by a local conference committee and then on appeal by a committee of the international associations; that the Union "shall not engage in any strike, sympathetic or otherwise, or boycott, unless the employer shall fail to live up to this contract;" and "no employer shall engage in any lockout unless the Union or members thereof fail to live up to this contract"; and "that until January 1, 1909, 54 hours shall constitute a week's work, and that thereafter during the life of this contract 48 hours, of 8 hours a day, shall constitute a week's work." The contract went into effect May 1, 1907, and by its terms was to continue in force for 5 years; i. e., until May 1, 1912. There were a number of minor provisions which had relation to these main provisions. Amongst others was a provision as to what would constitute a fulfillment by the employer of his contract, dependent upon which was the question as to whether there would be a strike. It was that "paying the scale of wages and living up to the shop practices as settled by the committee, regardless of his employés' union affiliations," would be such a fulfillment. The clause "regardless of his employés' union affiliations" was considered by both parties to the contract as permitting an open shop as distinguished from a closed shop.

The provision in this contract, action calculated to bring about a breach of which on the part of the appellees was sought to be enjoined, was that by which the Union was not to engage in any strike unless the employers should fail to live up thereto. The action on the part of the appellee Berry which was sought to be enjoined was announcing the result of a referendum on the subject and inciting the members of the Union to strike, and that on the part of the appellee McMullen was the paying out of strike benefits. The action sought to be enjoined, therefore, was not the threatened violation of a negative covenant, as maintained by the appellants' counsel, but action on the part of the appellees calculated to bring about a violation of such a covenant. This, possibly, is a more favorable view of the matter for appellants;

and it may be questioned whether the payment of strike benefits alone can properly be said to be action calculated to bring about a breach of that provision of the contract, inasmuch as it would follow such a breach.

Now, as stated, there is a controversy as to whether the appellants were entitled to the relief they sought, or any part of it, even though it be conceded that there was the contract as claimed by appellants. This phase of the case presents very interesting and possibly novel questions for decision. In order to dispose of them it would have to be settled just who the contract was really between. Nominally it was between the two international associations. But really it could not have been so, because each of said associations lacked juristic personality. So far as there was any real contract at all, it must have been between the individual members of the different local associations. If so, this gives rise to the question whether it was a contract between all the members of the Typothetæ, whether they have any members of the Union in their employ or not, on the one side, and all the members of the Union, whether they are in the employ of the members of the Typothetæ or not, on the other, opening and letting in individuals as they become members of either organization and also opening and letting out such members thereof as might withdraw or be expelled therefrom; or was the contract limited to members of the Typothetæ who might have members of the Union in their employ on the one side, and members of the Union who might be in the employ of members of the Typothetæ on the other? If it were either, it would seem to be a joint contract on each side. The theory of appellants' case would seem to be that it is neither; for, if it was such, then the right of the members of the Typothetæ who were parties to the contract being joint, it might be thought that to a suit brought to protect the contract from invasion all of them were indispensable parties plaintiff, and, though some might sue for all, as the suit was limited to those who were not citizens of Ohio, the lower court was without jurisdiction, and the bill should have been dismissed for want of it, and not on the merits. To meet this view it would seem that the theory of appellants' case must be otherwise, to wit, that, though formally the contract was between the two international associations, it was really a separate contract between each member of the Typothetæ who had members of the Union in his employ on the one side and the members of the Union in his employ on the other; or rather, that the provisions of the contract, upon its being entered into, became terms of the separate contracts of employment between each member of the Typothetæ and the members of the Union in his employ. So taking the contract really to have been, there can be said to be no question as to the jurisdiction of the lower court. All members of the Typothetæ who had members of the Union in their employ were not indispensable parties plaintiff to the suit, and if any question can be made as to the right of some to sue for all of a limited number thereof—i. e., all not citizens of Ohio—or as to their suing for members of the Typothetæ who had no members of the Union in their employ, it is not a question affecting jurisdiction. On such theory of

the case an authority in support of the jurisdiction of the lower court and the right of a portion of the Typothetæ who had members of the Union in their employ may be found in the case of Bacon v. Robertson, 18 How. 480, 15 L. Ed. 499. This theory of the real nature of the alleged contract and of appellants' case is a reasonable one, and without more we accept it as correct and dispose of the appeal on that basis.

As to whether otherwise appellants were entitled to the relief they sought, assuming that such contract was entered into by the two associations, which has been much discussed by counsel, we do not find it necessary to consider, as we are constrained to hold with the lower court that no such contract was entered into, and hence pass it by. The alleged contract, as stated, was executed on January 8, 1907. It was signed on that date in the name of each association by its board of directors; the third vice president of the Union not signing. It was understood at the time of the signing that the board of directors of the Typothetæ had no authority to make a binding contract on its behalf, and the signing so far as it was concerned was expressly made subject to ratification by that association. A meeting thereof was held thereafter on February 2, 1907, at Pittsburg, for the purpose of ratifying the action of its board of directors, and at that meeting that action was ratified. The board of directors of the Union, at the time of the signing of the contract, claimed to have authority to make a binding contract on its behalf, and by their action attempted to do so. The third vice president refused to sign it because of the open shop clause therein heretofore referred to. Otherwise he sanctioned the contract, and it must be held that he was willing to its execution, and so far as he had power he authorized its execution. He was simply unwilling to attach his name thereto. There is no question that the board of directors of each association sincerely believed that the board of directors of the Union had full authority to make a binding contract on its behalf. In this, however, we believe they were mistaken, and it is for this reason that the lower court and we likewise hold that there was no such contract entered into between the two associations. Their authority, like that of the board of directors of the Typothetæ, was simply to negotiate a contract on behalf of the Union with the Typothetæ, and such contract had to be ratified by the Union association before it was binding upon it. The sole authority which the board of directors of the Union had to act on behalf thereof was because of action taken by it at its annual meeting held in June, 1906, preceding the date of the execution of the contract at Pittsburg, Pa.; and the sole evidence of that action upon which our conclusion can be based is the minutes of the proceedings of that meeting published in the American Pressman, the official organ of the Union, in its issue of September, 1906. This case here hangs upon a true construction of that action as thus evidenced.

A transaction or expression of a thought whose true nature or meaning is in question and sought to be determined is, like a jewel, seen at its best in its setting; and a part of the setting of a transaction or expression of a thought is the history that lies behind it and out of which

it has come. Before stating, therefore, what that action of that meeting of the Union was, and attempting to construe it, the steps leading up to it should be presented, and that chronologically. To do so will lengthen somewhat this opinion and tend to make it tedious; but the matter we have in hand is to demonstrate that the board of directors of the Union were in error in their construction of their authority. They and the members of the Typothetæ, who also sincerely believe that they had authority to make a binding contract, are intelligent men and capable of appreciating the reasonableness of the position taken here, and it will serve the ends of justice to so present the matter that they may do so.

The contract in question is not the first contract entered into between the two associations. At the time it was signed, as heretofore stated, there was a binding contract in existence between them which would expire May 1, 1907, when it was to begin to operate. That contract had been executed March 25, 1903. It had been executed on behalf of both associations by its board of directors. Before that execution, to wit, in July, 1902, under authority of both, it had been negotiated by the two boards. After this, to wit, at its annual meeting in September, 1902, this contract so negotiated was ratified by the Typothetæ and its final execution was then authorized; and subsequent to such ratification it was submitted to a referendum of the Union, by which it was ratified and its final execution authorized. On each side, then, no binding contract was executed until the action of its board of directors was ratified. The Typothetæ as to the contract in question gave its board of directors no greater authority than it had given them in the first instance, to wit, to negotiate it, and it did not become binding until ratified. If, then, the Union gave its board authority to make a contract binding without being reported back and ratified, it did more than it had done in the first instance, and that in the face of the fact that the Typothetæ had not given such authority to its board or without conditioning their authority so to act on similar authority being conferred by the Typothetæ. The contract so negotiated and executed, which was the first contract entered into by the two associations, contained exactly the same provision as the one in question as to strikes, boycotts, and lockouts. It contained substantially the same provisions in relation to disputes between local associations. The contract in question made some additions and changes in the subordinate provision relating to this main provision. The provision in relation to hours of work contained therein was as follows, to wit:

"It is expressly agreed that during the life of this contract 54 hours shall constitute a week's work."

The only material difference between the two contracts, then, was in relation to the hours of work; the first contract providing for 9 hours a day or 54 hours a week, and the one in question for the same hours until January 1, 1909, and thereafter during its life for 8 hours a day or 48 hours a week. So much, then, as to the first contract, the manner of its execution, and its provisions.

Long before its expiration agitation began within the Union for an 8-hour day. At the annual meeting of the Union at San Francisco in

June, 1905, a resolution was adopted instructing its board of directors to secure a conference with a committee of the Typothetæ "with a view of arranging, if possible, a workday of 8 hours." It further provided as follows:

"Failing to make a satisfactory agreement, we recommend the board to be constituted a shorter workday committee to begin a campaign with a view of demanding the eight-hour day at the expiration of our agreement on May 1, 1907, and being instructed to report to the next convention."

This action had no relation whatever to the execution of a new contract at the expiration of the existing one. It related solely to arranging with the Typothetæ for an eight-hour day, which, if agreeable to the Typothetæ, might begin before the expiration thereof, or might begin at the expiration thereof, or at some later date, and to a campaign amongst the members of the Union to demand such a day at the expiration of the contract in case of failure to so arrange. The board of the Union had no authority to make a binding arrangement in regard thereto. They had simply power to negotiate an arrangement to be reported back for consideration by the Union at its next annual meeting. The matter of an eight-hour day was treated on this occasion separate and apart from the matter of a new contract at the expiration of the old from this time on.

September 1, 1905, this resolution was communicated by the president of the Union to the secretary of the Typothetæ to be presented at its annual meeting that same month at Niagara Falls for its consideration. The hope was expressed that it would be considered by them "in a spirit that will evade any possibility of a demand from us at any time on a question so dear to our desires of having the working day of our membership brought to a workday of eight hours." In response to this, the board of the Union was invited to attend that annual meeting of the Typothetæ. This they did. It seems that, some time prior to this, if not prior to the San Francisco convention, the San Francisco Typothetæ had conceded to the members of the Union in that city the eight-hour day, and against this action the Typothetæ protested. The ground of the protest does not clearly appear. It may be that it was because it had been wrung from the San Francisco Typothetæ when by the contract between the international associations the nine-hour day was to last until May 1, 1907. When at Niagara Falls on this occasion the board of the Union met the board of the Typothetæ, the former pressed the desire for an eight-hour day, and the latter the San Francisco matter. Neither succeeded in gaining its point. The board of the Typothetæ, in reply to the arguments of the board of the Union to agree on a day for the eight-hour day, replied "that it was an inopportune time to present it, on account of the conditions existing that they were not able to have changed." They separated with a promise on the part of the board of the Typothetæ to send the board of the Union an answer to the eight-hour resolution, setting forth the exact position of the Typothetæ on the subject. Nothing more transpired on the subject until the following spring. April 11, 1906, the president of the Union wrote a letter to the secretary of the Typothetæ calling attention to the promise as to an answer to the reso

lution "bearing on the eight-hour day," and requesting that the matter be taken up soon by their board, and that he let him hear from him "as to their action thereon." On April 28th the secretary of the Typothetæ wrote the president of the Union stating that the board thereof "declined to take up the consideration of an eight-hour day, but will be pleased to appoint a committee to confer with a similar committee from the Pressmen's Union to consider the renewal at its expiration of the agreement which now exists between our respective organizations." To this the president of the Union replied May 1, 1906. He expressed regret that the board of the Typothetæ failed to leave the matter of the eight-hour day resolution "within the scope of the labors of the committee that they suggest be appointed to confer and consider the renewal of the agreement existing between our respective organizations," and said further:

"Had the eight-hour day resolution come within such a committee's consideration while in conference, it might have made it possible for me to have such a committee appointed prior to our convention which meets in Pittsburg, Pa., in June. The appointing of such a committee at this time would leave them without power of any kind in considering a renewal of the existing agreement until our convention expresses itself on the future of that document. I will place your letter before our convention, and you will no doubt be informed as to the future course of our organization on the question of the committee's appointment and the power given them in the consideration of the agreement's renewal with your organization, as well as other things that such a committee may be delegated to discharge in conference with your committee."

This is all that transpired between the two associations in relation to the matter in hand prior to the June convention, 1906, of the Union at Pittsburg, at which the action was taken which it is claimed by appellants amounted to conferring on its board power to make a binding agreement with the Typothetæ in renewal of the then existing contract. That contract had first been negotiated and then ratified before finally executed. The Union had taken up the matter of arranging for an eight-hour day without reference to a renewal of that contract, and the resolution adopted in relation thereto provided that whatever arrangement was made should be reported to the succeeding convention. The Typothetæ had refused to consider the eight-hour day. Nothing had been said or done in its behalf, indicating that at any time it would agree thereto. The matter of renewal of the contract was brought up by the Typothetæ, and not by the Union, and its only suggestion in regard thereto was that a committee be appointed on both sides "to consider the renewal." It was not contemplated by it, that the committee appointed in relation thereto on either side should have authority to execute a binding agreement in renewal of the existing contract. So far as it was concerned, it was not contemplated that any course should be pursued different from what had been followed in connection with that contract.

The convention of the Union met at Pittsburg in June, 1906, that being the time of the year for all its annual conventions; the annual conventions of the Typothetæ being held in September of each year. Each of the five officers of the Union, as usual, made a report to the convention. We have to do only with the report of the president. In

this report he treated the renewal of the agreement with the Typothetæ and the eight-hour day subject as separate and distinct matters. The one was considered under the title "The U. T. A. Agreement," and the other under the title "Eight-Hour Day." Concerning the former subject, this is what he had to say, and all he had to say:

"This agreement also expires May 1, 1907. In a letter received from Secretary John MacIntyre, appearing in another part of this report, that organization requests that we appoint a committee to meet with a like committee from the U. T. A. for the purpose of effecting a continuance of the agreement at its expiration. I am heartily in favor of such a committee being appointed. The agreement has worked well during its past years of utility, we having made splendid strides under its provisions. While this agreement has come in for considerable abuse, and we have received considerable condemnation in certain quarters for what is called its 'open shop' provision, we have had but little complaint of any advantage being taken of us by the U. T. A. employers, and in the spirit of equity and fairness that both sides should have towards each other I am firmly of the opinion that it has been a success, and trust, when our committee meets with a like committee from the U. T. A. to discuss its renewal and other matters of interest to us, that they will, beyond question, come closer to each other in the mutuality of interest which fair dealing and equity towards each other's organization requires, in the full independence of each in carrying on the business for which both organizations are created."

The letter referred to by the president in this portion of his report is that of date April 28, 1906, hereinbefore referred to and quoted from by us. That portion of his report in which it appears is under the "Eight-Hour Day" title in the course of his narration of what had taken place in regard thereto. It will thus be noted that all the committee to be appointed in relation to the renewal of the agreement was to have to do, according to the suggestion of the secretary of the Typothetæ, was "to consider the renewal thereof," and, according to the recommendation of the president of the Union to his convention, which had the appointing power on its behalf, was "to discuss its renewal."

In dealing with the subject of the "Eight-Hour Day" in his report the president narrated what had taken place in regard thereto, beginning with the San Francisco resolution as we have hereinbefore set it forth, and followed the narration up with a recommendation. He put this forward, however, not as his recommendation, but as that of the board of directors. It was to them that the matter of arranging for an eight-hour day had been committed by the preceding annual convention at San Francisco, and it was fitting that the recommendation should come from them. The matter of renewing the agreement with the Typothetæ had not theretofore been committed to the board, and hence the recommendation in regard thereto came from the president alone. The recommendation in regard thereto is in these words:

"As the last convention delegated the question of the shorter workday to the board of directors, and with the correspondence as above, and their knowledge of affairs before them, they beg leave to report to the convention the following plan whereby some tangible method or course may be arrived at that will result in the adoption of the eight-hour day by the I. P. P. and A. U.:

"(1) That this convention instruct the incoming board of directors to meet as a committee with a like committee on the part of the United Typothetæ of America, as explained in the letter to Mr. MacIntyre under date of April

28th, herein mentioned—the committee on our part to strive with all power possible to have some concessions made by the Typothetæ towards having the eight-hour day established within reasonable time, in a manner that will warrant its adoption on mutual grounds as a finality; the committee on our part having power to sign up an agreement if the eight-hour day can be brought within a reasonable time of attainment; if not, the committee to report back to our next convention, as provided in section 6 of this report.

"(2) That an assessment of 50 cents per month be levied upon all pressmen members monthly from July 1, 1906, until July 1, 1907.

"(3) That an assessment of 25 cents per month be levied upon all feeder or assistant members monthly during the same period.

"(4) That this fund be sent to the International secretary-treasurer monthly by the secretary of each local union, the same to be deposited in a different bank from that in which we deposit our regular funds, and the same to be known as the 'Shorter Workday Fund.'

"(5) The question of what year and date the eight-hour day shall be adopted shall remain within the keeping of the incoming board of directors, they to report to the next convention in full their observations and judgments as to what our future course should be in setting a date for the adoption of the eight-hour day.

"(6) In view of the fact that our agreement with the United Typothetæ of America will not expire until May 1, 1907, the board of directors feel that the provisions of section 4 of this report would be the wisest course to follow, until at least another convention had followed the carrying out of the first three sections of this report, in order that an opportunity may be given the membership to understand our financial strength, as well as hearing from the incoming board of directors a report of the work done by them during the year towards an amicable adjustment of the shorter workday, or eight-hour day, with the United Typothetæ of America.

"(7) The wisdom of the above course is, in the estimation of the board of directors, the safest and best way for us to proceed, that we may feel our way carefully towards accomplishing the greatest amount of progress along the eight-hour day program, of not only trying to place our membership upon an eight-hour basis, but by the entire printing industry as well, in all sections where it is an industry of any importance, the same as was the nine-hour day in 1898.

"(8) In connection with our own efforts along the above lines, we should also court the aid and assistance of the other branches of the printing trade, in so far as trying to have a unity of purpose in placing the printing industry on an eight-hour basis as well as our membership in it.

"(9) While we would like to see our membership on an eight-hour basis, we should try with every means within our power of agitation and co-operation to bring the whole printing industry on an eight-hour basis, not forgetting the fact that this was accomplished when the nine-hour day was established in the printing industry.

"(10) The success achieved in our nine-hour day effort is possible in the adoption of the eight-hour day, and while recent events in the printing industry have mooted this possibility, it is still within our right and efforts to try at least along the lines adopted in bringing the printing industry to a nine-hour basis in 1898.

"(11) The foregoing report is made in outline of what should be done by the membership towards acquiring the eight-hour day, and while we all would like to see it come as soon as possible, we should not attempt to enforce it with a strike until all other means had failed to secure it, and our finances and organization are made such that, in the event of failure to accomplish our desire along the lines of easy approach, we can leave the date of enforcing it within the keeping of those whom we elect to administer our affairs, and then, when they inform us of what course we should pursue, we will know that the time has been carefully considered and our duty and finances will have to aid us in doing the rest."

It will be noted that in the recommendation as to the renewal of the contract no suggestion is made as to who shall constitute the com-

mittee to consider and discuss the matter. The recommendation here simply follows the suggestion of the Typothetæ's secretary as to the matter. On the other hand, in the recommendation as to the eight-hour day, it is specifically recommended that the board of directors have charge of that matter. Of course, under other circumstances, it would have to be held that the president contemplated that the committee having in charge the matter of renewal of the existing contract would have to do with the matter of the workday, as that matter was covered by the existing contract. But in view of the fact that the matter of the workday had been treated by the Union as a matter separate from that of a renewal of the contract, and was so treated by the president himself in his report, and different recommendations were made in regard thereto, there is hardly any room to hold that the president contemplated that the committee appointed in response to his recommendation as to the renewal of the contract would necessarily have anything to do with the matter of a workday.

It will be noted, further, that in the recommendation of the board of directors, through the president, in relation to the eight-hour day, they were to be given power to conclude a binding contract with the Typothetæ; i. e., one not subject to subsequent ratification by the Union. This contract, however, was not a renewal of the existing contract between the two associations, but a contract in relation solely to the eight-hour day. The board were given power to make such a contract with the Typothetæ, provided the eight-hour day could be brought within a reasonable time, and the board were to have the power of determining what was a reasonable time.

The items of this recommendation of the board of directors, through the president, other than the first one, have to do with raising a fund preparatory to a strike in the event of a refusal on the part of the Typothetæ to agree with the board of the Union on the subject, leaving the consideration of the time when, in that event, an eight-hour day should be demanded by the Union and a strike made to enforce it to the board, postponing that time until after the next annual convention, and to general expressions covering the desirability of an eight-hour day and what should be done to bring it about.

This is all the president's report to the Pittsburg convention of 1906 contained on either subject. This report, along with the reports of each of the other officers of the Union, was referred to a committee styled "Committee on Officers' Reports." That committee afterwards reported back to the convention. In relation to the president's report it made three recommendations, one general and two specific. One of the specific recommendations related to the matter of renewing the contract with the Typothetæ. The other related to the matter of an eight-hour day. The general recommendation was in these words:

"The committee have carefully gone over the many sections comprising the president's very voluminous and comprehensive report, and we find them very ably edited and throughout a very instructive instrument in the hands of every person interested in the I. P. P. and A. U. movement, and a thoroughly concise statement of the condition at present obtaining in the pressmen's craft. Your committee recommends the acceptance of the report as a whole, and desire this convention to concur therein."

The specific recommendation as to the renewal of the contract with the Typothetæ was in these words:

"We, the committee, recommend that the board of directors be instructed to meet with like committee on the part of the U. T. A., with instructions to secure a renewal of the agreement with a declaration as to whether the eight-hour day will be agreed to."

The specific recommendation as to the eight-hour day was in these words:

"The committee are pleased to coincide with the recommendations of the board of directors, inasmuch as they are of such a nature that the committee have seen fit to indorse the plan of assessment as formulated by the board, to wit:

" '(2) That an assessment of 50 cents per month be levied upon all pressmen members monthly from July 1, 1906, until July 1, 1907.

" '(3) That an assessment of 25 cents per month be levied upon all feeder or assistant members monthly during the same period.

" '(4) That this fund be sent to the International secretary-treasurer monthly by the secretary of each local union, the same to be deposited in a different bank from that in which we deposit our regular fund, and the same to be known as the "Shorter Workday Fund." '

"And that we recommend that this convention declare in favor of the eight-hour day immediately after the expiration of the agreement now existing between the U. T. A. and the I. P. P. and A. U., provided it is not within the scope of the possibilities of having same arranged amicably and equitably between the U. T. A. and the I. P. P. & A. U. within a reasonable time after the expiration of the agreement now existing between these two respective organizations."

Counsel for appellants seem to think that, at this convention, in addition to there being a committee on officers' reports, to whom the president's and other officers' reports were referred, there was another committee, styled "Committee on U. T. A. Agreement," to whom the matter of renewing that contract was referred, and still another one, styled "Committee on Eight-Hour Day," to whom this subject was referred, and that the first specific recommendation above quoted came from the first of these two additional committees, and the second recommendation above quoted came from the second one. But such was not the case. There were no such two additional committees. Both of these two specific recommendations, as well as the general recommendation, came from one and the same committee, to wit, the committee on officers' reports. This being so, these two specific recommendations qualify the general recommendation. In so far as they depart from the recommendations in the president's report, the committee did not intend, by recommending generally that that report be accepted and concurred in, to recommend that that portion of the president's report should be accepted and concurred in. In recommending specifically something different therefrom, they showed that it could have had no such intent; and it is to be noted that the general recommendation is that the president's report be accepted and concurred in "as a whole."

Such, then, is the historical setting of that action of the Union at Pittsburg which is relied on as conferring authority on its board of directors to make the contract of January 8, 1907. That action was an adoption of the two specific recommendations of the committee on

officers' reports. In the course of the reading of the report of that committee, as each specific recommendation was read, a motion was made that it be adopted, and was at once put before the convention and carried. It is urged on behalf of the appellants that the question of adopting the general recommendation of the committee was put to the convention and carried. If such was the case, the convention could not have intended thereby to do anything more than the committee intended in making the recommendation, and that was to cover all the president's report except those portions thereof covered by the two specific recommendations. The claim is that this question was put and carried at the close of the reading of the committee's report. That portion of the record in the American Pressman relied on as showing this follows immediately upon the statement that a motion was made to adopt the second specific recommendation above and was then put and carried. It begins with these words:

"At this point Secretary-Treasurer Webb relieved Mr. Lyons in the reading of the reports of the committee. Mr. Webb then read to the convention the discussion of the eight-hour day question as it appears in the president's report. Delegate McDonald moved that the recommendation of the committee on officers' reports be adopted."

Then follows an introduction by the chairman of the convention of President Glocklin, of the International Bookbinders, in these words:

"The president of the International Bookbinders and the secretary of the same are present. They held a convention last week, and went on record on the eight-hour day proposition pretty much on the same lines we have. I will present to you President Glocklin of the International Bookbinders."

This is followed by a speech from that official setting forth the action of his organization in relation to the eight-hour day, which was, substantially, that a committee of the bookbinders be appointed to act in conjunction with the officers of the Union in taking steps towards securing an eight-hour day. Then comes a statement by the chairman of the Union convention in these words:

"The question comes on the recommendation of the committee. As you will notice in the committee's report, they instruct your executive board to meet in conjunction with a committee of the bookbinders and allied trades with a view of seeing whether we can mutually agree, if we are successful in trying to map out a mutual agreement as to when we will enforce an eight-hour day on the lines laid down by the executive committee of the past year. Are you ready for the question?"

This is followed by the statement:

"The question was then put and carried."

There is nothing whatever indicating that McDonald's motion and the question then put to the convention and carried had relation to the general recommendation of the committee on officers' reports at the beginning of its report. It must be taken to have had relation solely to that committee's recommendation as to acting in conjunction with a committee of the bookbinders in relation to the eight-hour day.

It follows, from this extended consideration of what the American Pressman shows as to action of the Union, that the recommendations contained in the president's report were never put to the convention.

In the natural order of things it is not to be thought that it was. That report was referred to the committee on officers' reports and came before the convention solely through that committee; and its recommendations in regard to the matters covered by the president's report, and not his, were put before the convention and adopted.

The authority of the board of directors of the Union in relation to the contract of January 8, 1907, depends entirely, then, on the two specific recommendations of the committee on officers' reports which were adopted by the convention. If such authority is not to be found there, it did not exist. According to appellant's counsel, the first one is "not altogether clear," the meaning of the other is "somewhat ambiguous and doubtful," and both are "awkwardly expressed." It is from resolutions which they so characterize that the authority in question has to be deduced.

Clearly no such authority is to be found in the adoption of the second specific recommendation in relation to the eight-hour day. The fact that the board of directors had recommended that it be given power to sign up an agreement in relation to the eight-hour day, if it could be brought within a reasonable time, and to this end to determine what was a reasonable time, and that this recommendation was not concurred in by the committee on officers' reports, but another recommendation was made in regard thereto in substitution therefor, and that this recommendation, and not the board's recommendation, was adopted, has a tendency to show that no such authority was within the meaning of the substituted recommendation so made and adopted. It is true that this recommendation of the committee here starts out with the words:

"The committee are pleased to coincide with the recommendations of the board of directors."

But these words are immediately followed by the following ones:

"Inasmuch as they are of such a nature that this committee have seen fit to indorse the plan of assessment as formulated by the board, to wit."

Then are set forth items 2, 3, and 4 of the board's recommendation in relation to the plan of assessment. These succeeding words qualify the preceding general words, and show that the only portion of the board's recommendation which the committee coincided with was the provision for and plan of assessment. What follows is simply a recommendation that the convention set forth its position in relation to the eight-hour day by declaring in favor of its inauguration immediately after the expiration of the existing contract with the Typothetæ, provided it was not within the scope of the possibilities of having it arranged amicably and equitably between the two associations within a reasonable time after the expiration thereof. The board recommended that it be empowered to conclude a binding agreement as to inauguration of eight-hour day within a reasonable time, leaving it to it to determine what was a reasonable time. The committee recommended that the convention simply declare its position in regard to the eight-hour day, which was that it should be inaugurated after the

expiration of the existing contract, provided it could not be amicably arranged to begin within a reasonable time thereafter.

This brings us to the first specific recommendation. This is the only one of the two that can be said to have conferred any power whatever on the board of directors. The second, as we have seen, simply indorsed the board's recommendation as to an assessment and the manner thereof, and declared the Union's position in regard to the eight-hour day. In this recommendation the committee brought together again the two subjects of a renewal of the existing contract and of the length of the workday, which had become separated as hereinbefore indicated. It is short and to the point. It instructs the board of directors to meet a like committee of the Typothetæ and secure from it two things—"a renewal of the agreement," and "a declaration as to whether the eight-hour day will be agreed to." Though the existing contract covered the length of the workday, making it nine hours, it could not have been intended that the board was to secure a renewal of the agreement in that particular. What was meant was that it should secure a renewal thereof except in that particular. The length of the workday was to be covered by the second thing which the board was authorized to secure. Then as to the meaning of the instruction to secure a renewal of so much of the existing contract. It was not to execute anything. It was to secure—i. e., obtain or get— something from a like committee of the Typothetæ, and, of course, something which it was within its power to give. The only thing which it was within its power to give was an expression of willingness to renew so much of the existing contract, a tentative agreement on the part of the Typothetæ to renew that portion thereof. The second thing which the board was directed to secure was a declaration, and the first was to be of like character. At any rate, if it were at all possible to hold that the first part of the instruction which it was recommended should be given to the board was to execute a binding contract on behalf of the Union, it is not possible to hold that it was intended that such contract should cover the matter of the length of the workday. This is negatived by the second part of the instruction, which was simply that a declaration on the part of the Typothetæ as to whether the eight-hour day would be agreed to should be secured.

The action of the Pittsburg convention of June, 1906, of the Union amounted, therefore, to this and nothing more. It thereby declared itself in relation to the eight-hour day and made provision for a fund to pay strike benefits in case it should thereafter determine to strike to secure such a day; and it instructed its board of directors to secure from a like committee of the Typothetæ a declaration of its position as to the eight-hour day in connection with an agreement to renew the existing contract between the two associations in so far as it did not cover the length of the workday. If such is the extent of its action, it follows that the Union's board had no authority to execute the contract in question on behalf of the Union. Of course, the board was to report back to the next convention what it so obtained for its consideration. This followed as a matter of course, without anything being said expressly on the subject.

It is true that it further follows from this that no provision was made to govern the relations between the two associations after May 1, 1907, when the existing contract would expire, and none could be made unless a convention of the Union, as well as of the Typothetæ, were called in advance of their regular time of meeting; that of one being in June and the other in September. But the Union had its heart set on the eight-hour day. It is plain that it was unwilling to continue amicable relations with the Typothetæ, except under an agreement that the eight-hour day should begin within what it considered to be a reasonable time. So far as it was concerned, the parting of their ways had come, except on these terms. The Typothetæ had not up to this time indicated in any way its willingness to come to an eight-hour day. So far as it had expressed itself, it had been against coming thereto. There was, therefore, not much occasion for the Union being desirous or even willing to make provision for a new contract between the two associations to begin at the expiration of the old. All that was to be expected of it from its standpoint was an indication of its willingness to enter into a new contract with the Typothetæ if it would first declare that it would agree to an eight-hour day; and that is practically what it did, and all it did.

Such we understand to be the true construction of the action of that convention in relation to the matter as shown by the record of what took place printed in the official organ of the Union. As to what took place, of course, that record must be accepted as controlling. But our views of what it shows is substantially borne out by the testimony of witnesses who were delegates to the convention from the Chicago and New York Unions. They testified that, according to their understanding and that of the delegates to the convention with whom they came in contact at that time, the board was not empowered to bind the Union, but had to report what took place between them and the Typothetæ committee to the next convention of the Union for its consideration and ratification; and immediately after the contract in question was entered into both of those Unions protested against it on the ground that the Union board had exceeded its authority.

As a matter of fact, the provision in the contract as to the time when the eight-hour day should go into effect was acceptable to the members of the Union. But by this time a movement in favor of a closed shop had arisen in the Union. It was because of the open shop provision therein that the Union's third vice president refused to sign the contract on its behalf. At its next convention, held at Brighton Beach, New York, in June, 1907, the delegates in favor of eliminating that provision from the contract were in the majority. They selected a new set of officers with one exception, the appellees being two of the new ones selected; and in relation to the contract in question they took the following action, to wit:

"Whereas, our board of directors has renewed the agreement with the United Typothetæ of America: Now, therefore, be it

"Resolved, that said agreement is ratified and approved, provided the 'open shop' clause is stricken out and the amendment is inserted providing for nine hours' pay for the eight-hour day. And it is further

"Resolved, that, in the event the U. T. A. rejects these amendments, our board of directors are instructed to submit the question of the immediate

inauguration of the eight-hour day to referendum, said referendum to be taken thirty days after such rejection."

So far as the amendment providing for nine hours' pay for the eight-hour day was concerned, there would probably have been no trouble in its being adopted by the Typothetæ; for evidently what was in mind in the agitation for an eight-hour day was, not simply securing such a workday, but nine hours' pay therefor. It was the elimination of the provision as to the open shop that was unacceptable to the Typothetæ. The board of directors of the Union and the executive committee of the Typothetæ met at Niagara Falls in September, 1907, during the latter's annual convention at that place, and conferred concerning their differences. They were unable to agree. The board of the Union urged the acceptance of the two amendments. The executive committee of the Typothetæ refused to accept either, claiming that a binding contract existed between the two associations, and demanded that it be lived up to. They parted, each adhering to its position. Thereafter the immediate inauguration of an eight-hour day was submitted to a referendum of the Union by its board of directors, pursuant to the June, 1907, resolution. If carried, it meant a strike if that day was not immediately acceded to by the Typothetæ; and before its result was known the union members of Chicago and New York did strike. This submission and these strikes were at once followed by the suit we have here.

It is urged on behalf of appellants that at no time after the execution of the contract on January 8, 1907, and before the suit was brought, did the Union, or any one on its behalf, ever take the position in express terms that its board of directors were without authority to make a binding contract on its behalf; that it is not so stated in the resolution adopted in June, 1907, nor was it stated by any member of the board of directors of the Union at the conference in September, 1907. This may be conceded; but it was presupposed by and necessarily involved in the position that the Union had taken. It took the position that the contract was not binding upon it, was subject to its ratification, and that it had a right to propose amendments thereto. The only possible ground for this position was that the board was without such authority. This being so, it is of no consequence that lack of authority was not claimed in express terms.

It is urged on behalf of appellees that the contract was not binding on the Union for the further reason that it was not an exact renewal of the existing contract, in that it made changes in and additions to the subordinate provisions relating to the main provisions as to the settlement of disputes between local unions, and the third vice president did not sign the contract. It is unnecessary to determine either of these questions, as we hold that the board of directors was without authority to execute the contract on the Union's behalf.

The decree appealed from is affirmed.